UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                                          :
                                                :
                                                :      Chapter 7
JASON M. KAHAN                                  :      Case No. 24-11592-JEB
          Debtor                                :
                                                :
                                                :

### DEBTOR'S MOTION FOR DECLARATORY DETERMINATION
### REGARDING THE OWNERSHIP OF THE DEBTOR'S BITCOIN

To the Honorable Janet E. Bostwick, Chief Bankruptcy Judge:

Now respectfully represents Jason M. Kahan (herein "Debtor"), Debtor in the above-captioned Chapter 7 proceeding, who moves this Honorable Court for a declaratory determination regarding the underlying ownership of the Debtor's bitcoin because the Debtor has three (3) parties interested in bringing this "ferschlepta krenk" (Yiddish and quite apt: "Fershlepta krenk" (or *farshlepte krenk*) is a Yiddish phrase meaning something long, tedious, a chronic illness, or a drawn-out ordeal, like a complicated story or endless bureaucracy. It describes something that drags on unpleasantly, often referring to a difficult, protracted situation that feels like a lingering sickness) finally to an end.  The Debtor's saga of his bitcoin has now been before this Court, for better or worse, since November 2023 and apart from it being an interesting story replete with many "bubbe meises," (Yiddish and also quite apt: "Bubbe meises" (or bubbe meise) is a Yiddish term meaning "grandmother's tales," used to describe old wives' tales, myths, folklore, or exaggerated stories often passed down through families, similar to English "old wives' tales," but frequently containing a kernel of cultural or historical truth), according to the docket, nothing has really occurred since the 2004 examinations of the individual holding the bitcoin.

As the Court is aware, Donald Lassman, Esquire (herein "DL"), the Debtor's Chapter 7 Trustee, is in a unique situation where (i) the Debtor's scheduled claims are approximately $5.0 million, (ii) the Debtor's total estate, which if not for the bitcoin would be an assetless one, is at current values approximately $180.0 million, and (iii) the Debtor holds a greater interest in his

estate than his creditors whose interest in the Debtor's estate is less than 3%.  In such a situation, the Debtor has been approached by three (3) parties proposals who evince an interest in acquiring the Debtor's bitcoin and, in each instance, the parties are proposing to acquire the bitcoin and in so doing funding an escrow account for the Debtor's creditors with DL of $10.0 million; sufficient to liquidate ALL of the Debtor's claims.  This fund is and will be part and parcel of the parties' proposals.

The one proviso and condition precedent for each of these parties is that the Court confirm that the 1810 bitcoin as scheduled in the Debtor's petition is in fact owed by the Debtor.  Upon the Court issuing an order confirming that each one of these parties is prepared to act and fund the $10.0 million escrow account with DL, which will result in the conclusion of this matter.

In support hereof, the Debtor states the following:

1.     That the Debtor's Chapter 7 commenced on August 7, 2024, with the filing of the instant petition.

2.     That DL was appointed successor Chapter 7 Trustee to John Desmond, Esquire on or about September 8, 2024, and has acted as the Chapter 7 Trustee since that time.

3.     That at the time of the filing, the Debtor listed as one of his assets on Schedule B an accumulation of 1,810 bitcoin now having a market value of approximately $180.0 million.

3.     That since the time of the filing, the Debtor believes that DL has confirmed that the Debtor is the owner of 1,810 bitcoin having, as noted supra, a current value of approximately $180.0 million.

4.     That seeking to confirm the existence of the Debtor's bitcoin, DL appointed both counsel (Mark DeGiacomo, Esquire) and special counsel (Kenneth Cuccinneli, Esquire) as his counsel to assist in the recovery of the Debtor's bitcoin which are not currently held by the Debtor.

5.     That it has been determined that the Debtor's bitcoin is being held by a gentleman having the name of Hunter Penn (herein "Penn"), who is believed to currently reside in Springfield, Massachusetts and claims to be the "custodian" of the Debtor's bitcoin.

6.      That Penn, who is believed to hold the code necessary to access the bitcoin, has refused and continues to refuse to return the bitcoin to its rightful owner, the Debtor.

7.      That DL's special counsel has conducted a 2004 examination of Penn wherein the latter admitted that the bitcoin he holds is bitcoin rightfully owned by the Debtor (N.B. A review of the 2004 examination transcript and exhibits will confirm that).

8.      That attached hereto as Exhibit A is the affidavit of Attorney Cuccinneli which states unequivocally that in his opinion the bitcoin belongs to the Debtor.

9.      That until this time, there has been little to no action taken on the docket to recover to Debtor's bitcoin through any means available though 85 bitcoin has gone missing.

10.     That the Debtor, in working to secure the release of his bitcoin so that it can be utilized to liquidate the claims in his bankruptcy and then provide him with a nice recovery, has secured three (3) proposals that the Debtor believes are of interest to all concerned and should be considered prior to any other matter regarding the Debtor's bitcoin.

11.     That the Debtor has received offer from the following regarding the bitcoin:

        a.      **Anchorage Digital Bank**: Anchorage Digital Bank is a global crypto platform that enables institutions to participate in digital assets through custody, staking, trading, governance, settlement, and the industry's leading security infrastructure. Home to Anchorage Digital Bank N.A., the first federally chartered crypto bank in the U.S., Anchorage Digital also serves institutions through Anchorage Digital Singapore, which is licensed by the Monetary Authority of Singapore; Anchorage Digital New York, which holds a Bit License from the New York Department of Financial Services; and self-custody wallet Porto by Anchorage Digital.

        Founded in 2017 in San Francisco, California, Anchorage Digital has offices in New York, New York; Porto, Portugal; Singapore; and Sioux Falls, South Dakota. The company is funded by leading institutions including Andreessen Horowitz, GIC, Goldman Sachs, KKR, and Visa, with its Series D valuation over $3 billion.

        Our co-founders, Diogo Mónica and Nathan McCauley, are patent-holding, world-class security engineers—so security is integral to our safe and accessible platform. We've grown significantly since our founding, providing services to many of the largest and most prestigious

institutions, securing tens of billions of dollars in digital assets, and hiring experienced talent from platform security, financial services, and distributed ledger technology.

Anchorage Digital Bank's proposal is annexed hereto as Exhibit B.

b. **Soda Ventures**: Soda Ventures is a crypto-native venture capital dedicated to shaking up the crypto world. We celebrate those who fully integrate into the crypto ecosystem, championing decentralization, and driving innovation through blockchain technology and community collaboration. We are part of the future of decentralization.

Soda Ventures proposal is annexed hereto as Exhibit C.

c. **Wave Digital Assets**: Wave Digital Assets (known as "Wave"), is a SEC-registered investment advisory firm that provides a unique combination of venture capital, fund, and private wealth management to the digital asset ecosystem. Founded in Los Angeles in 2018 by a team of highly experienced crypto natives and financial services professionals, Wave brings together smart capital strategies, deep institutional expertise, and cutting-edge ideas to help investors unlock the potential of digital assets. Wave has managed over $1B AUM and is registered with the US Securities & Exchange Commission as an investment adviser, CRD# 305726.

Wave Digital Assets proposal is annexed hereto as Exhibit D. Though unexecuted, the parties have agreed and an executed copy of in the process of being circulated.

11. That it should be noted that any proposal that utilizes a loan to liquidate the claims in the Debtor's Chapter 7 shall be repaid from the Debtor's bitcoin interests and will be solely his responsibility,

12. That the Debtor suggests that each of the proposals speak for themselves and the Debtor holds no opinion on either proposal; the Debtor is only concerned about the establishment of the $10.0 million escrow account with DL and at this point is willing to take his chances on whichever proposal assists in freeing his bitcoin.

13. That the Debtor believes there is sufficient evidence confirming the Debtor's ownership of the bitcoin, that the Court can declare the Debtor as the owner of the bitcoin and by doing so, allow this case to conclude with a 100% payment to the Debtor's creditors.

14.     That attached hereto as Exhibit E is a copy of the so-called Chain of Custody document that each of the proposing parties would like the Court's execution on because in the world of bitcoin this is part of the bitcoin ownership quotient and confirms that the bitcoin belongs to the Debtor in the world of bitcoin.

WHEREFORE, the Debtor Jason Kahan requests that this Honorable Court declare the bitcoin currently held by this estate his and for such other relief that this Honorable Court deems appropriate and just.

Respectfully submitted
JASON KAHAN
By his attorney


/s/ Barry R. Levine
Barry R. Levine (BBO No. 296500)
100 Cummings Center – Suite 327G
Beverly, MA 01915
Dated: January 22, 2026          978.922.8440 – phone
barry@levineslaw.com

-5-

<u>CERTIFICATE OF SERVICE</u>

I, Barry R. Levine, state that on January 22, 2026, I electronically filed the foregoing **DEBTOR'S MOTION DEBTOR'S MOTION FOR DECLARATORY DETERMINATION REGARDING HIS OWNERSHIP OF THE DEBTOR'S BITCOIN** with the United States Bankruptcy Court for the Eastern District of Massachusetts using the CM/ECF System.  I served the foregoing document on the following CM/ECF participants:

> Donald Lassman, Chapter 7 Trustee
> Richard King, Office of the United States Trustee
> Richard F. Tenney, Enterprise Bank and Trust
> Vladimir von Timroth, for A & M Management Group, LLC
> Alan Braunstein, First Boston Association
> Alan M. Cohen, Fidelis Residential
> Kathleen Cruickshank, Harold Murphy, Chapter 7 Trustee
> Mark DeGiacomo, for the Chapter 7 Trustee
> Kenneth Cuccinneli, for the Chapter 7 Trustee
> Sara Kathryn Jackson, for Richard King

And all other creditors notice by first class mail postage prepaid on the same date.

> /s/ Barry R. Levine
> Barry R. Levine

# EXHIBIT A – AFFIDAVIT OF KEN CUCCINNELI

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                                          :
                                                :
                                                :       Chapter 7
JASON M. KAHAN                                  :       Case No. 24-11592-JEB
         Debtor                                 :
                                                :
                                                :

### AFFIDAVIT OF KENNETH T. CUCCINELLI, II, ESQUIRE

I, Kenneth T. Cuccinelli, Esquire, being duly sworn and under oath depose and state:

1.      That I am an attorney duly admitted to the bar in the Commonwealth of Virginia, in good standing with the bar, and I maintain a place of business at 10007 North Harris Farm Road, Spotsylvania, VA.

2,      That on January 15, 2025, the court appointed trustee in the above case, Donald Lassman, filed an Application for Authority to Employ Kenneth T. Cuccinelli, II as special counsel (docket document no. 118) to pursue certain claims held by the Debtor's estate.

3.      That on February 19, 2025, the Court approved my appointment as special counsel to the Chapter 7 Trustee (docket document no. 137).

4.      That as part of my brief, I conducted a 2004 examination of Hunter Penn on October 2, 2025.  Hunter Penn is the person who took the keys to the Debtor's bitcoin wallets.

5.      That from the evidence given at Mr. Penn's 2004 examination, I am now convinced more than ever that the bitcoin belongs to the Debtor.

6.      That from my review and understanding of the record of this matter and as a result of my inquiry, I can without equivocation state that the bitcoin belongs to the Debtor.

7.      I left the service of the appointed trustee as special counsel by mutual agreement on January 7, 2026.

8.      On January 8, 2026, I was once again retained by Jason Kahan to serve as counsel to him on legal matters, but not to carry on his bankruptcy case.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 21st DAY OF JANUARY 2026.

  /s/ Kenneth T. Cuccinelli
Kenneth T. Cuccinelli

# EXHIBIT B – PROPOSAL OF ANCHORAGE DIGITAL BANK

Docusign Envelope ID: 5E4E582D-A70A-4EA5-99FA-1E1BD0506099



## ORDER FORM

| **Anchorage Contact** | **Client Contact** |
|---|---|
| Name: Amar Vanmali | Name: Jason Kahan |
| Email: amar@anchorage.com | Email: jackreacher100@icloud.com |

This MASTER CUSTODY SERVICE AGREEMENT (**"Agreement"**) is made and entered into as of the Effective Date provided herein, by and between Anchorage Digital Bank N.A. (**"Anchorage"**), and each Client as provided herein (each a **"Client"**) (Anchorage and Client, each a **"Party"** and collectively, the **"Parties"**). The Agreement consists of the terms in this Order Form and the following Standard Terms and Conditions: https://anchorage-digital.docsend.com/view/hq4ruk657snz88yn

| 1. | **Effective Date:** | 1/16/2026 | 1:16 PM PST |
|---|---|---|---|
| 2. | **Initial Term:** | One (1) year | |
| 3. | **Renewal Term:** | One (1) year | |
| 4. | **Client(s).** Each "Client" listed herein is subject to the Agreement as if this Agreement were between such individual Client and Anchorage, except specifically the Fees will be calculated on an aggregated basis, including the sum of all Clients' Assets Under Custody. | | |
| | | Jason Kahan, an individual account | |

**5. Fees.**

In full consideration for Anchorage's provision of the Services described herein, Client will pay Anchorage the following fees (**"Fees"**). Fees will start accruing from the Effective Date of this Agreement (**"Fees Commencement Date"**). Fees will be due within thirty (30) days from the date of the invoice.

Changes to the Services, including the inclusion of new assets or Clients, are subject to changes in Fees. Fees shall be invoiced by Anchorage, and paid by Client, in US Dollars (**"USD"**).

(v. 0-25)                                                                                     Confidential & Proprietary

Docusign Envelope ID: 5E4E582D-A70A-4EA5-99FA-1E1BD860A68F

| FEE TYPE | AUC TIER (graduated basis) | Annual Basis Points |
|---|---|---|
| Monthly Custody Fee | Less than or equal to $100m | 25 |
| | Greater than or equal to $100m but less than $500m | 20 |
| | Greater than or equal to $500m | 15 |
| One-Time Onboarding Fee | $0.00. | |
| Monthly Minimum Fee | $0.00 | |
| On-Chain Services | Varies based on service. | |

**Fees shall be calculated separately on a graduated basis for the amount of AUC in each AUC Tier according to the applicable Annual Basis Points for that AUC Tier.**

*Example:*

*Tier 1 = less than $10m; Annual Basis Points at 35 bps*

*Tier 2 = $10 - 100m; Annual Basis Points at 25 bps*

*Client shall pay 35 bps for the first $10m under custody, and 25 bps for the next $90m under custody.*

**Client shall pay a Fee** which shall be the greater of i) Monthly Custody Fee, or ii) Monthly Minimum Fee.

**6.   Address for Notices:**

To Client(s):   **Invoice Email:** jackreacher100@icloud.com
**Notice Email:** jackreacher100@icloud.com
**Attention:** Jason Kahan Individual Account
23 Sagamore Ln
Boxford, Massachusetts 01921
United States

**To Anchorage:**   legal@anchorage.com AND
custodyexecutive@anchorage.com
Anchorage Digital Bank N.A.
101 S. Reid Street, Suite 307 #329
Sioux Falls, South Dakota 57103

IN CONSIDERATION AND WITNESS WHEREOF, Anchorage and Client, by their duly authorized representatives, hereby execute this Agreement as of the Effective Date.

**ANCHORAGE DIGITAL BANK N.A.**          **ON BEHALF OF EACH CLIENT SET FORTH HERETO**

By: *Jake E. Childs*          By: *Jason Kahan*
CCC2FC395FCB4BD...          3E53D61021094D4...
Name:  Jake Childs          Name:  Jason Kahan

(v. 0-25)          Confidential & Proprietary

Docusign Envelope ID: 5E4E582D-A70A-4EA5-99FA-1E1BD...

Title:  Head of Asset Management

Title:  Jason Kahan

Company: **Jason Kahan Individual Account**

Confidential & Proprietary

**AFFILIATED BUSINESS DISCLOSURE**
**AND CONFLICT OF INTEREST WAIVER**

Anchorage Digital Bank N.A. ("**Anchorage Digital Bank**") is affiliated with Anchor Labs, Inc., Anchorage Hold LLC, Anchorage Digital Singapore Pte. Ltd., and other affiliates (each an "**Anchorage Affiliate**"), through common ownership and management. In particular, Anchor Labs, Inc. provides certain administrative, technology, marketing, and other support services for custodial accounts on behalf of Anchorage Digital Bank. Because Anchorage Digital Bank and Anchorage Affiliates are under common ownership and management, the owners of Anchor Labs, Inc. will receive an indirect benefit from any fees you pay to Anchorage Digital Bank. In addition, Anchorage Digital Bank and Anchorage Affiliates may each provide services to its own clients that are also participating in any additional optional services supported by both Anchorage Digital Bank and Anchorage Affiliates. Anchorage Digital Bank and Anchorage Affiliates may refer clients to each other, and cooperate with each other, for the performance of these shared services. If Anchorage Digital Bank offers additional optional services to clients to participate in a network of services offered by Anchorage Affiliates, and you choose to participate in such services, you hereby acknowledge and consent to the sharing of Client Data (as defined in this Agreement) between Anchorage Digital Bank and Anchorage Affiliates in order to provide such services to you. Any sharing of Client Data shall be subject to the Data Processing Addendum (as defined in this Agreement) agreed between the applicable parties, and all applicable Laws. Your use of services of Anchorage Digital Bank may result in benefits from such referral to the other companies by virtue of the companies' common ownership and management.

ACKNOWLEDGEMENT

I, duly authorized and on behalf of each Client as set forth in the Order Form, have read this disclosure form, and I acknowledge and understand that Anchorage Digital Bank and Anchorage Affiliates are under common ownership and control. I further acknowledge and understand that by retaining Anchorage Digital Bank, I am providing an indirect financial benefit to the owners of Anchorage Affiliates. Understanding the common ownership and control of the companies, I agree to utilize the services of Anchorage Digital Bank freely and with no influence from anyone. I also understand and agree that Anchorage Digital Bank may share Client Data with any Anchorage Affiliate for the purpose of facilitating additional optional services to participate in a network of services offered by Anchorage Digital Bank, and Anchorage Affiliates. I acknowledge and understand that any referrals for services among Anchorage Digital Bank and Anchorage Affiliates may result in the owners of the referring company receiving an indirect financial benefit from the services provided.

*[Signature page to follow]*

(v. 0-25)                                                                    Confidential & Proprietary

**ON BEHALF OF EACH CLIENT SET FORTH HERETO**

By: ⸢ Signed by:
    *Jason kahan*
    └─ 3E53D6102109404
Name: Jason Kahan

Title:  Jason Kahan

Company: **Jason Kahan Individual Account**

anchorage
digital

## INFORMATION SHARING CONSENT

Anchor Labs, Inc. and its subsidiaries (herein referred to as **"Anchorage Digital"**) takes the protection and use of its customers' and counterparties' personal data seriously. As such, personal data is processed in accordance with the various privacy notices available in Anchorage Digital's online Privacy Center.

A1, Ltd. **("A1")**, an Anchorage Digital company and an exempted company incorporated in the Cayman Islands, has received a request from **Jason Kahan Individual Account ("You")** to engage in digital asset trading. You have also informed A1 that You are a client or counterparty of Anchorage Digital Bank, N.A. **("ADB" or "We")**, also an Anchorage Digital company. In order to expedite the necessary due diligence and approval processes required by A1 before A1 is able to start digital asset trading with You, we offer You the option for ADB to share information collected by ADB during its due diligence of You with A1. Should You decide to opt-out of this information sharing option to expedite A1's due diligence of You, please do not sign this Information Sharing Consent Form **("Consent Form")**.

The information that would be shared, should You agree to this Consent Form include:

- Your information, if an entity, including: Organization charts, ownership structure, legal entity formation documents, BSA/AML regulatory status and policies, and proof of registration;
- Beneficial ownership on You if applicable, including: First name, last name, ownership percentage, date of birth, country of residence, and physical address of beneficial owners;
- Identifying information on You, key personnel, associated parties, and related parties, including: First name, last name, ownership percentage, if any, date of birth, country of residence, and physical address;
- Photo ID documentation (e.g. Passport, Driver's License, or other government-issued ID) on You, associated parties and related parties;
- Information on trading supervisor(s), including: First name, last name, ownership percentage, if any, date of birth, country of residence, and physical address;
- Contact email address and email address for trade confirmations and other communication; and,
- Key personnel names and roles, including: Key risk personnel, associated persons, and company directors.

Your consent will remain in effect until You notify ADB of Your request to withdraw Your consent. You may do so at any time by emailing privacy@anchorlabs.com. In Your withdrawal, please include Your name as it appears exactly on this Consent Form, and Your request. Your withdrawal will be effective on the next business day the withdrawal request is received, unless we are unable to identify You based on the information contained in the withdrawal request. In such a case, we will reach out to You for further clarification. You understand that information already shared prior to the withdrawal request cannot be reversed and Your withdrawal request will apply going forward.

A1 will protect Your information in accordance with the various privacy notices available in Anchorage Digital's online Privacy Center.

January 1, 2026

Confidential & Proprietary

# Electronic Record of Contracts

This document was generated as a record of certain contracts created, accepted and stored electronically.



## Summary of Contracts

This document contains the following contracts.

| Title | ID |
|---|---|
| Data Consent Form (Jason Kahan Individual Account and Anchorage Digital) | c860af03-a126-4af6-b848-e72d2ca3748e |

## Contract signed by:

**Jason Kahan**

Signer ID:    9cb7f373-077b-4f78-8431-2712c307124d

Email:    jackreacher100@icloud.com

Date / Time:    Jan 12, 2026 at 7:12 PM UTC
IP Address:    71.184.97.243
User Agent:    Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/143.0.0.0 Safari/537.36 Edg/143.0.0.0

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E56A4FD



**MASTER PURCHASE AND SALE AGREEMENT**
**FOR DIGITAL ASSETS**

This MASTER PURCHASE AND SALE AGREEMENT FOR DIGITAL ASSETS (this "**Agreement**"), is made and entered into as of this January 1, 2026, by and between A1, Ltd., a Cayman Islands exempted limited liability company ("**A1**") and the entity identified below ("**Counterparty**", and together with A1, the "**Parties**").

| Counterparty Name | Jurisdiction | Counterparty type of entity |
|---|---|---|
| Jason    Kahan    Individual Account | US | Individual Account |

    **WHEREAS** A1 desires to enter into purchase or sale transactions in digital assets on a principal basis (each such trade, a "**Transaction**") with the Counterparty.

    **NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**SALE AND PURCHASE OF DIGITAL ASSETS**

1. Execution
    a. Trade Request: The Counterparty may request a transaction to be executed ("**Trade Request**") either directly via chat or other electronic or non-electronic communication or via a proprietary electronic order execution system for digital assets maintained by A1 or by any other means of communication mutually agreed by the Parties. Upon receipt of a Trade Request, A1 may accept or reject such Trade Request in its sole discretion or may offer a modified Trade Request. A1 may return an accepted Trade Request to the Counterparty at any time. Acceptance of a Trade Request does not obligate A1 to enter into any Transaction with the Counterparty.
    b. Binding Transaction: Once Counterparty and A1 have agreed to the terms of a sale or purchase, including (i) the asset being traded; (ii) the amount of the asset being traded; and (iii) the price per unit of the traded asset, the Trade Request shall be a binding Transaction for both Parties.
    c. Settlement: The Transaction shall be settled in accordance with the terms in the attached Settlement Annex.
    d. Collateral: A1 reserves the right to require the Counterparty to transfer digital assets or cash to A1 as collateral in advance of entering into a Transaction to address the present, future, actual, contingent or prospective obligations of a Counterparty, such collateral shall be posted in accordance with the Collateral Annex.
    e. Prefunding: A1 reserves the right to require the Counterparty to transfer digital assets or cash to A1 in advance of entering into a Transaction to address the present, future, actual, contingent or prospective obligations of a Counterparty (such transferred digital assets or cash "**Prefunded Assets**"). The Counterparty acknowledges and agrees that upon the transfer, all right, title and interest in and to the Prefunded Assets will pass to A1. The Prefunded Assets held by A1 will be an unsecured amount owed by A1 to the Counterparty. This means that:
        i. the Prefunded Assets will not be held by A1 for or on behalf of the Counterparty (whether in a segregated account or otherwise);

        ii. A1 can deal with the Prefunded Assets as its own property; and
        iii. in the event of A1's insolvency, the Counterparty will only have an unsecured claim against A1 for a cash repayment obligation of an amount equivalent to the value of the Prefunded Assets, and such claim will be subject to the exercise by A1 of any set-off rights A1 may have under this Agreement or under applicable

◆◆ anchorage
◆◆ digital

laws and regulations.

The Counterparty has the right to demand the return of Prefunded Assets by giving five (5) business days' notice in writing and A1 will transfer ownership of some or all of those Prefunded Assets back to the Counterparty, if, in A1's reasonable opinion, it considers that the aggregate value of the Prefunded Assets exceeds the amount necessary to cover the Counterparty's obligations to A1, subject to the exercise by A1 of any set-off rights it may have under this Agreement or under applicable law and regulation.

f.  <u>Confirmation</u>: A1 will confirm the terms of the Transaction in a confirmation ("**Confirmation**") which will be the final legally binding terms of the Transaction and will supersede any conflicting agreement between the Parties. Upon receipt of the Confirmation, the Counterparty must within one hour of receipt of the Confirmation, review the Confirmation and report any errors or omissions to A1. If the Counterparty has not reported any error or omission to A1 within one hour of receipt of the Confirmation, the Confirmation shall be deemed to be correct. The failure of A1 to send a Confirmation shall not affect the validity of a Transaction.

g.  <u>Authorized Traders</u>. A1 may rely on any communication provided by any person that A1 reasonably believes is authorized by Counterparty, whether or not such person has actual authority, and Counterparty agrees to be bound by such communications.

h.  <u>Forks and Airdrops</u>. Unless otherwise agreed, any purchased digital asset will not include any additional digital assets resulting from a fork or airdrop that has occurred after execution and before settlement.

i.  <u>Conflicts</u>. A1 is not the Counterparty's fiduciary, agent or broker. As a result, A1 may have actual or potential conflicts of interest that cannot be completely eliminated. A1 engages in transactions with a large number of different counterparties, each of whose interests may differ. A1 may seek to anticipate near-term counterparty demand and take positions in connection with its risk management activities. A1 may hold positions or trade in a way that may not be aligned with the objectives of the Counterparty.  A1's activities in the market may impact the execution or price of the Counterparty's Transactions.

j.  <u>Manifest error</u>. If, after the execution of a Transaction, A1 determines that the Transaction contained a Manifest Error, A1 reserves the right to cancel such Transaction whereupon neither Party shall have any obligation to the other in respect of such Transaction. "<u>Manifest Error</u>" means, in relation to a Transaction, the occurrence of an error that A1 reasonably believes to be obvious or palpable, including, but not limited to, quotations for exaggerated quantities or at manifestly incorrect prices.

**REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS**

2.  <u>Representations and Warranties.</u> Each Party represents and warrants to the other, as of the date hereof and as of the date of each Transaction that:

a.  If the Counterparty is not a natural person, (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized; (ii) it has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate any Transactions; and (iii) its execution and delivery of this Agreement, its performance of its obligations hereunder and the consummation of the Transactions have been duly authorized by all requisite action on its part;

b.  This Agreement has been duly executed and delivered by such Party and constitutes valid and legally binding obligation, enforceable against Counterparty in accordance with its terms;

c.  Neither the execution and delivery of this Agreement, nor the consummation of the

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E304CFA



Transactions, does or will violate any applicable law, rule or regulation or conflict with, violate or constitute a default under any material agreement to which it is a party;

d. It is trading as principal for its own account and not for the account of any other individual, person or entity. For the avoidance of doubt, neither party shall be deemed a client or customer of the other, each is a principal counterparty to the Transaction;

e. it has not relied on the other party for any tax or accounting advice concerning this Agreement and it has made its own determination as to the tax and accounting treatment of any Transaction;

f. Neither it, any direct or indirect owner, nor any Person who controls it, or in the case of a natural person, any relative or close associate or any person who controls the assets used in settlement of any Transaction: (i) bears a name that appears on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC from time to time; (ii) is a Foreign Shell Bank; (iii) resides in or transfers funds from or through an account in a Non-Cooperative Jurisdiction; or (iv) engages in any Prohibited Businesses;

g. With respect to any digital asset such Party sells, transfers and delivers to the other Party, the transferring Party is the lawful owner of such digital asset with good and marketable title thereto, and the transferring Party has the absolute right to sell, assign, convey, transfer and deliver such digital asset. Such digital assets are free and clear of any and all security interests, liens, pledges, claims (pending or threatened), charges, escrows, encumbrances or similar rights;

h. It is the owner of each wallet to which it instructs the other Party to make a transfer, and it has good title thereto. Each of its wallets is owned and operated solely for the benefit of such Party, and no person, other than such Party, has any right, title or interest in any such wallet. Notwithstanding the foregoing, each Party may on occasion utilize omnibus wallets on an exchange or at a custodian to settle a Transaction, and such wallets are not owned and operated solely for the benefit of such Party;

i. It is at all times during the term of this Agreement and any Transaction hereunder, in compliance with all applicable laws, rules and regulations in all material respects. It is not, and has never been, engaged in any market manipulation, front running, spoofing or any other illegal activity;

j. It is not acting as an exchange, broker or custodian of the other Party;

k. It is an eligible contract participant under section 1a(18) of the U.S. Commodity Exchange Act, as amended;

l. It is not providing the other Party any fiduciary, advisory, exchange or other similar services to the Party, any person related to or affiliated with such Party, any customers of such Party, or any Transaction subject to this Agreement; and

m. It is solely responsible for any decision to enter into a Transaction subject to this Agreement, including the evaluation of any and all risks related to any such Transaction. In entering into any Transaction, it has not relied on any statement or other representation of the other Party.

3. A1 represents that it is engaged in the bilateral purchase and sale of digital assets, including any Transaction contemplated by this Agreement, solely on a proprietary basis for investment purposes for its own account.

4. Counterparty represents that (i) it is not organized in the states of Vermont or Nevada; (ii) does not have a principal place of business in the states of Vermont or Nevada; and (iii) does not have trading supervisory persons located in the states of Vermont or Nevada.

5. If the Counterparty is represented by an Agent, the Agent represents and warrants to A1 as of the date hereof and as of the date of each Transaction that the Agent is authorized to act on behalf


anchorage
digital

of the Counterparty and to make the representations, agreements and acknowledgements in this Agreement on behalf of the Counterparty.

## DEFAULT

6.  Events of Default. Any of the following events that occur with respect to the Counterparty will be considered an event of default ("Event of Default"). If the Counterparty has an Event of Default with respect to one Transaction, this shall be deemed to be an Event of Default with respect to all unsettled Transactions:

    a.  failure to settle any Transaction when due;
    b.  failure to settle in accordance with the Settlement Annex;
    c.  any representation or warranty proves to be untrue in any material respect;
    d.  a breach in the performance of any other material agreements, conditions, covenants, provisions or stipulations contained in the Agreement;
    e.  default in any other agreement or failure to perform any obligation, with A1 or any of its affiliates;
    f.  any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Counterparty; or
    g.  any material adverse change in the assets, business, liabilities, results of operations, prospects, financial condition, value of the business, or the ability of the Counterparty to perform its obligations under the Transaction, as determined by A1 in its reasonable discretion.

7.  Remedies. Upon the occurrence of any Event of Default, A1 may, at its option: (i) close-out, cancel, terminate and/ or liquidate any Transaction or Prefunded Assets of the Counterparty; (ii) use the proceeds obtained from any sale or liquidation to discharge any of the Counterparty's obligations to A1, including any losses and costs; (iii) in lieu of liquidating any Transactions, elect to determine in good faith, its losses and costs in connection with the Counterparty's obligations and calculate the amounts owed by Counterparty; (iv) exercise any and all rights under the Collateral Annex; and (v) set-off, net, and recoup any due and payable obligations to Counterparty under this Agreement against any due and payable obligations to the A1. A1's rights and remedies hereunder are cumulative and are in addition to any other rights and remedies available in law or equity. Counterparty shall remain liable for any unpaid amounts, and, to the extent permitted by law, for interest (as determined by A1) on any amount not paid when due.

## CONFIDENTIALITY

8.  Non-Disclosure. Each Party shall at all times maintain the confidentiality of Confidential Information with the same standard of care as it uses for its own confidential information, but no less than a reasonable standard of care, and will not disclose any Confidential Information or permit any Confidential Information to be disclosed, either directly or indirectly, to any third party without the disclosing Party's prior written consent. A Party may only disclose Confidential Information to its employees, directors, officers, members, agents, affiliates, and professional advisors or to financial institutions of such Party who have a need to know such Confidential Information for the purpose of carrying out such Party's obligations under the Agreement. If either Party is required by law, rule or regulation, (the "Required Party"), the Required Party will, to the extent legally permissible, provide the other Party (the "Subject Party") with prompt written notice of such requirement so that such Subject Party may seek an appropriate protective order or waive compliance with this Section. The Subject Party shall promptly respond to such request in writing by either authorizing the disclosure or advising of its election to seek (at its sole cost and expense) a protective order, or, if such Subject Party fails to respond promptly, such disclosure shall be deemed approved. The confidentiality obligations set forth in this Section shall

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E96C5D1



survive the termination or expiration of this Agreement. Notwithstanding the foregoing, no such notice shall be required in case of routine regulatory audits by a regulatory body having or claiming jurisdiction over the Required Party. "**Confidential Information**" means any non-public information or data provided or disclosed to a receiving Party in any form or medium including information regarding the disclosing Party's or its affiliates' financial condition, management and business, business relationships, accounting practices, systems, contracts, and/or investment strategies as well as the terms and existence of this Agreement and any Transaction. Notwithstanding the above, Confidential Information shall not include information that (i) is or becomes available to the general public other than by disclosure by a receiving Party or its representatives; (ii) was known to a receiving Party previously or was rightfully obtained by a receiving Party from a third party, provided that, in either case, the source of such information was not known to be bound by a confidentiality obligation with respect to such information; or (iii) is independently developed by a receiving Party.

9. Publicity. Neither Party shall use any other Party's trade names, trademarks, service marks, or domain name, or otherwise refer to any other Party in any promotional material, website, advertisement, news release or any other publication without such Party's prior written consent.

10. Data. A1 is the sole owner of, and retains all right, title and interest in, any price quotation or other pricing data ("**Data**"), including all intellectual or proprietary rights therein or related thereto. Counterparty may only use Data for the purpose of entering into Transactions with A1. Counterparty will not, and will not permit anyone to, copy, reproduce, retransmit, redistribute, furnish, communicate or otherwise make available any portion, derivation or revision of the Data in any medium, print or electronic, in any manner, whether within or outside Counterparty other than as is necessary to effectuate the Transactions, without the express written consent of A1, except on an anonymized basis to its customers solely for the purpose of facilitating Transactions hereunder. Without limiting the generality of the foregoing, Counterparty may only share Data with its employees, representatives, and affiliates on a need-to-know basis for purposes of trading and shall not share the Data with any proprietary or quantitative trading desks of Counterparty. Data constitutes "Confidential Information" under this Agreement, subject to the exception in the previous sentence.

**LIMITATION OF LIABILITY; INDEMNITY**

11. Limitation of Liability. Neither Party shall have liability: (i) for any act or omission (including insolvency) or delay of any third party, including any bank, digital wallet provider or digital currency exchange or any of their agents or subcontractors, (ii) for any interruption or delays of service, system failure, or errors in the design or functioning of any electronic system, or (iii) for any consequential, indirect, incidental, or any similar damages, other than documented costs of hedging (even if informed of the possibility or likelihood of such damages).

12. Indemnity. Counterparty will indemnify, defend and hold A1 harmless together with its officers, directors, members, affiliates, employees, agents and licensors (the "Indemnified Parties") from and against all losses, liabilities, judgments, claims, damages and costs (including attorneys' fees) resulting from any third-party action related to: (i) Counterparty's breach of the terms of this Agreement, (ii) Counterparty's violation of any applicable law, rule or regulation, (iii) A1's reliance on any instruction (in whatever form delivered) which it reasonably believed to have been given by Counterparty, or (iv) other acts or omissions by Counterparty in connection with the execution of Transactions with A1. Counterparty will not settle any matter without A1's prior written consent unless such settlement contains a full release of the Indemnified Parties and does not otherwise require an admission of liability by any Indemnified Party. For the avoidance of doubt, this indemnity provision shall survive any termination of this Agreement.

**MISCELLANEOUS**



13. <u>Term</u>. This Agreement shall remain in effect until terminated in writing by either Party; provided, however, that any termination shall not affect the Parties' obligations with respect to any Transactions entered into prior to such termination.

14. <u>Electronic trading</u>: If Counterparty effects transactions through any electronic means, including through the internet, application programming interface, computer to computer interface or any trading system provided by A1, then Counterparty agrees to the <u>Electronic Trading Terms of Service</u> (as amended from time to time).

15. <u>Risk Acknowledgements.</u>    Counterparty agrees and acknowledges the risks disclosed at <u>https://www.anchorage.com/risk-disclosures</u> (as amended from time to time).

16. <u>Data Privacy</u>. Counterparty and A1 agree that the Data Processing Addendum provided at: <u>https://anchorage-digital.docsend.com/view/rw4azp2vuz6p9dhh</u> (as amended from time to time) shall apply to and is incorporated into this Agreement.

17. <u>Rounding.</u> A1 applies certain rounding conventions. Details of these conventions are available on request.

18. <u>Definitions.</u> Capitalized terms not defined in the Agreement shall have the meanings given to them in the Definitions Annex.

19. <u>Taxes</u>. Each Transaction is exclusive of any applicable taxes. Each Party shall be responsible for paying its own taxes, if any, in connection with any Transaction.

20. <u>Notices, Consents, etc.</u> Notices hereunder will be effective upon delivery, if in writing and sent by hand, certified mail, or by overnight courier, return receipt requested, if to **A1**, c/o Mourant Governance Services (Cayman) Limited, P.O. Box 1348, 94 Solaris Avenue, Camana Bay, Grand Cayman KY1-1108, Cayman Islands, Attention: Legal Department, with an **email copy** to <u>legal@anchorage.com</u> and <u>trading@anchorage.com</u> and if to **Jason Kahan Individual Account**, to **23 Sagamore Ln, Boxford, Massachusetts 01921, United States** with an email copy to **jackreacher100@icloud.com**.

21. <u>Amendments; Waivers</u>. Counterparty agrees that A1 may amend the provisions of this Agreement at any time upon fifteen (15) days' notice to Counterparty. Counterparty acknowledges and agrees that by continuing to trade with A1 after such notice period, Counterparty accepts any such amendments to this Agreement. This Agreement may not be otherwise amended without the prior written consent of A1. No consent with respect to any action or omission by a Party shall operate as a consent to, waiver of, or estoppel with respect to, any other or subsequent action or omission. No failure to exercise and no delay in exercising any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy or power provided herein or by law or at equity.

22. <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

23. <u>Governing Law</u>. This Agreement shall be governed in all respects by the laws of the State of Delaware, without giving effect to principles of conflicts of law. The parties to this Agreement will submit all disputes arising under this Agreement to arbitration in the county of New Castle in the

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E...



State of Delaware or the United States District Court for the District of Delaware as a forum in accordance with the rules of the American Arbitration Association ("AAA"). No party to this Agreement will challenge the jurisdiction or venue provisions as provided in this section. ***Each of the Parties hereby waives all right to trial by jury in any lawsuit, action, proceeding or counterclaim arising out of this Agreement***.

24. <u>Entire Agreement</u>. This Agreement and each Transaction executed after the date hereof constitutes the entire agreement between the Parties and supersedes any existing agreements between the Parties, oral or written, concerning this subject matter.

25. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be an original, but all such counterparts taken together shall constitute one and the same instrument. Electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

*[Signature page follows]*

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E99A6E9



**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first above written.

**A1, LTD.**

By: *Gabriel Pires*

Name: Gabriel Pires

Title: Director

**Jason Kahan Individual Account**

By:

Name:

Title:

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E9A6C41



**SETTLEMENT ANNEX**

At 12PM New York time ("<u>Cutoff Time</u>") each New York business day (each such day a "<u>Settlement Day</u>"), all previously unsettled Transactions will be net settled in accordance with the following procedures:

1. Following the Cutoff Time, A1 shall send a calculation of all Transactions subject to settlement for the relevant settlement period ("<u>Settlement Amount</u>").

2. The Transactions to be settled in the relevant settlement period shall be net settled, provided they are in respect of the same digital asset and fiat cash currency. Accordingly, if the Parties entered into two or more outstanding Transactions with each other in a given settlement period, then: (a) the Party obligated to deliver the greater amount of a given digital asset across any such Transactions will deliver the net outstanding balance of such digital asset; and (b) the Party obligated to deliver the greater amount of cash across any such Transactions will deliver the net outstanding balance of cash.

3. Unless otherwise agreed, within one hour of the Counterparty receiving the Settlement Amount calculation from A1, Counterparty shall initiate the transfer of the Settlement Amount to A1's wallet or account, as specified by A1. Such Settlement Amount shall be delivered by 1PM New York time ("<u>Settlement Deadline</u>"). The delivery of the Settlement Amount will be complete once (x) in the case of digital assets, the transaction is verified by the relevant number of confirmations from the blockchain for the applicable digital asset as reasonably determined by A1, and the assets are available to A1 in its designated digital wallet or (y) in the case of cash, the cash is available to A1 in its designated account.

4. Unless otherwise agreed, after receiving delivery from the Counterparty, A1 shall initiate the transfer of relevant digital assets or cash, to Counterparty's wallet or account as provided by Counterparty. Counterparty acknowledges that A1's delivery may be delayed to any digital wallets or accounts that have not been pre-cleared by A1 in advance. Once A1's delivery is complete, the Transaction is final and irrevocably settled.

5. For each calendar day after the Settlement Day on which the Counterparty has not settled, A1 shall assess a default penalty fee of 20% (annualized, calculated daily) on all outstanding portions of the total unsettled balance. In addition to this default penalty fee, A1 may also require the Counterparty to pay any fees, losses, costs and expenses reasonably incurred by A1 as a result of the late settlement.



## DEFINITIONS ANNEX

Capitalized terms not otherwise defined in the Agreement shall have the meanings below.

"**Foreign Bank**" shall mean an organization that (i) is organized under the laws of a foreign country, (ii) engages in the business of banking, (iii) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations, (iv) receives deposits to a substantial extent in the regular course of its business, and (v) has the power to accept demand deposits, but does not include the U.S. branches or agencies of a foreign bank.

"**Foreign Shell Bank**" shall mean a Foreign Bank without a Physical Presence in any country but does not include a regulated affiliate.

"**Non-Cooperative Jurisdiction**" shall mean any country or territory that (i) has been designated as a jurisdiction under increased monitoring or a high-risk jurisdiction subject to a call for action by the Financial Action Task Force on Money Laundering ("FATF"), or (ii) has been designated as non-cooperative with international anti-money laundering principles or procedures by any other intergovernmental group or organization of which the United States is a member and with which designation the United States representative to the group or organization continues to concur.   See https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions for FATF's list of jurisdictions under increased monitoring and high-risk jurisdictions subject to a call for action.

"**OFAC**" shall mean the United States Office of Foreign Assets Control.  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at https://ofac.treasury.gov/.

"**Person**" shall mean any individual, corporation, partnership, association, limited liability company, trust, estate or other entity, either individually or collectively.

"**Physical Presence**" shall mean a place of business that is maintained by a Foreign Bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities, at which location the Foreign Bank (i) employs one or more individuals on a full-time basis, (ii) maintains operating records related to its banking activities, and (iii) is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities.

"**Prohibited Businesses**" shall mean  (a) unlicensed money services businesses; (b) manufacture, distribution, sale of marijuana, other drug, controlled substances, pseudo-pharmaceuticals, drug paraphernalia; (c) gambling activities; (d) money laundering, fraud, terrorist financing, or any other types of financial crimes; (e) ponzi scheme, pyramid schemes; (f) wash trading, front running, insider trading,



market manipulation, or other forms of market or securities fraud; (g) interactions with OFAC sanctioned jurisdictions, dark net marketplaces, ransomware, mixers/tumblers, ransomware, illicit activity designated wallets or destinations; (h) defense industry, ammunition, firearms, weapons, explosives, and manufacturers; (i) counterfeit coins and notes; (j) entities with bearer share ownership; (k) doing business with a financial institution classified as being of "primary money laundering concern" per a special measures determination by the U.S. Treasury under Section 311 of the USA PATRIOT Act; or (l) any prohibited business or trade restricted goods and services by the Cayman Islands government.

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E9A4F5D



**anchorage
digital**

### COLLATERAL ANNEX

This Collateral Annex ("<u>Annex</u>") supplements and forms part of and is subject to the Agreement.

**1.      _Collateral Terms_**
(a)      Collateral Posting and Collateral Valuation
Upon demand by A1, Counterparty will transfer the demanded amount of unencumbered Digital Asset or Fiat Currency to an A1 wallet address or A1 fiat bank account notified by A1 (together the "<u>Collateral Account</u>"). A1 will value the assets in the Collateral Account in its sole discretion and assign an USD order trading limit ("<u>Execution Limit</u>") for the Counterparty to execute Transactions. The Execution Limit may be modified by A1 at any time.
(b)      Return of Collateral
Upon Counterparty's written request and full and final settlement of outstanding Transactions, A1 shall within five business days of the request from the Counterparty, transfer ownership of the Collateral back to the Counterparty  provided that (i) immediately following such withdrawal or dealing, the amount of Digital Asset  or Fiat Currency held in the Collateral Account, will be equal to or exceed the Margin Requirement and (ii) such withdrawal is directed to an address or account in Counterparty's name that is and remains whitelisted in accordance with A1's policies and procedures.
(c)      Forks and Airdrops; Interest.
Counterparty shall not be entitled to any additional digital assets resulting from a fork or airdrop, or any other event that results in the creation of a new token or any perceived economic benefit to the Counterparty, that shall occur with respect to the Collateral unless otherwise agreed to by the parties. No interest shall accrue on any Digital Asset or Fiat Currency comprising Collateral.

**2.      _Grant of Security Interest_**
(a)      Any Collateral transferred to the Collateral Account shall be held in A1's own name and interest and not custodied or held on behalf of Counterparty and A1 shall have full rights and use over such Collateral. Counterparty's rights to such Collateral are limited to the rights specifically created under this Annex.
(b)      For valuable consideration, the adequacy and receipt of which is hereby acknowledged, Counterparty pledges, assigns, transfers and delivers to A1, and grants to A1 a continuing and unconditional first priority security interest in the Collateral as security for the payment and performance of Transactions and all its obligations under the Master Agreement.
(c)      Counterparty agrees that the security interest granted by Counterparty to A1 constitutes a valid, first priority security interest in the Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral related to any Transaction. Notwithstanding any termination of this Annex, A1's security interest in the Collateral shall remain in effect for so long as any Counterparty obligation remains outstanding under a Transaction.
(d)      Notwithstanding any other provision of this Annex or Section 9-207 of the UCC, Counterparty expressly grants A1 the right, to the fullest extent that it may effectively do so under applicable law, to re-register the Collateral in its own name or in another name other than the Counterparty's and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use the Collateral, including use the Collateral to for the purpose of collateralizing the Hedge, or for any other purpose not prohibited by this Annex, with all attendant rights of ownership except as provided herein. For the purposes of the return of any hypothecated Digital Asset to Counterparty, A1's return obligations shall be satisfied by delivering the hypothecated Digital Asset identical to such hypothecated Digital Asset.
(e)      Counterparty agrees that A1 has the rights stated above, with respect to the Collateral pledged for Transactions, in addition to all other rights which A1 may have by law.
(f)      Counterparty authorizes A1 at any time and from time to time, at Counterparty's expense, to file in any jurisdiction any financing statements and amendments that: (i) name the Collateral as collateral

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E56A4FD



thereunder, regardless of whether any particular items of Collateral can be perfected by filing a financing statement under the UCC; (ii) contain any other information required by the UCC for sufficiency or filing office acceptance, including organization identification numbers; and (iii) contain such language as A1 determines helpful in protecting or preserving its rights against third parties. Counterparty ratifies any such filings made prior to the date hereof.

(g)      Counterparty acknowledges that the Collateral shall be designated as a "financial asset" for purposes of Section 8-102(a)(9)(iii) of the UCC.

### 3.      *Representations and Warranties*

In addition to the representations, warranties and acknowledgements provided in the Agreement, each party provides the following additional representations and warranties to the other as of the date hereof and as of the date of each Transaction:

(a)      Each party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Annex and that it has made its own determination as to the tax and accounting treatment of any Transaction or any Digital Asset or funds received hereunder.

(b)      Counterparty represents and warrants that it has the right to transfer all Digital Asset and Fiat Currency that is provided as Collateral subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Annex and that such Digital Asset Collateral and Fiat Currency has been acquired in accordance with all Applicable Laws.

(c)      Counterparty will not create or allow any other security interest or lien on the Collateral, other than those created by this Annex. Additionally, upon A1's request, Counterparty will execute any financing statement or other document necessary to perfect or otherwise record A1's security interest in the Collateral.

### 4.      *Default*

In addition to the Events of Default in the Agreement, the parties agree that each of the following shall also constitute an Event of Default:

(a)      failure by Counterparty to comply with any Margin Requirement, including posting additional Collateral, immediately upon request by A1; and

(b)      any Collateral (or intended Collateral) ceases to be the subject of a valid, first priority perfected security interest in favor of A1 to secure the settlement of the Transaction, or Counterparty or any of its affiliates or officers, directors, brokers or agents makes a statement in writing to such effect.

### 5.      *Remedies*

(a) Upon the occurrence and during the continuation of any Event of Default, A1 may, at its option, without demand, presentment or notice, all of which are hereby expressly waived, (i) declare all Transactions outstanding hereunder due and payable immediately, (ii) exercise all other rights and remedies available to the A1 hereunder, the Agreement, under applicable law (including the UCC), or in equity and (iii) transfer that portion of the Collateral from the Collateral Account to A1's operating account that is necessary for the payment of all outstanding amounts due to A1 under this Agreement, including any outstanding Transactions and any costs associated with the settlement of the A1's Hedge, and any other costs incurred by the A1 due to such default; provided, that upon any Event of Default all Transactions shall automatically become and be immediately due and payable.

(b) In addition to any rights of set-off A1 may have as a matter of law or otherwise, upon the occurrence of an Event of Default, A1 will have the right (but shall not be obliged) to set off or apply any obligation of the Counterparty owed to A1 (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any of A1's obligations owed to Counterparty (whether or not matured or contingent and whether or not arising under this Agreement and regardless of the currency, place of payment or booking office of the obligation). For the purpose of cross-currency set-off, A1 may convert any obligation at the applicable market exchange rate available on the relevant date. If an obligation is unascertained, A1 may estimate that obligation and set

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E...



off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22ED26A5D



## DEFINITIONS

"*Applicable Law*" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws, ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, guidance notes, policy statements, customary laws, decrees, injunctions, or judgments and any (ii) ruling, declaration, regulation, requirement, request or interpretation issued by any (or any quasi-) regulatory, judicial, administrative or governmental body or person.

*Collateral Account*" means collectively, any wallet and/or fiat account used by A1 to hold the Collateral, with a book entry on A1's records identifying the Collateral as Counterparty's.
"*Collateral*" means all Digital Asset or Fiat Currency in the Collateral Account. Collateral includes: 1) the Collateral Account; 2) any new tokens  issued or interest paid with respect to any of the Collateral; 3) all rights to receive delivery of or withdraw any of the Collateral or equivalent thereof from the custodian or bank of the Collateral Account and all rights against the custodian  or bank with respect to the Collateral Account, any of the foregoing Collateral, and the proceeds thereof; and 4) all proceeds of the foregoing.
"*Digital Asset*" means any digital asset that the Counterparty and A1 agree upon.

"*Fiat Currency*" means the lawful currency of the United States, i.e., United States Dollars (USD), or such other lawful currency as agreed between the parties from time to time.
"*Governmental Authority*" means the government of any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.
"*Hedge*" means the A1's hedge (if any) of its risk with respect to any Transaction.
"*Margin Requirement*" means an amount determined by A1 from time to time in its sole discretion which may take into account, without limitation: (a) the then current value of the any outstanding liabilities owed to A1 under any Transaction; (b) a change in the market price, liquidity, volatility or any other factor which may have an effect on any Transaction or Digital Asset  or Fiat Currency recorded in the Collateral Account; and/or (c) any change in Counterparty's credit rating or creditworthiness (as determined by A1 in our sole discretion)
"*UCC*" shall mean the Uniform Commercial Code as in effect in the State of Delaware to the extent such terms are defined.

### Non-US Person Status Representation letter to A1 Ltd

We *Jason Kahan Individual Account* represent on behalf of ourselves and any and all users of ours trading with A1, Ltd ("**A1**") that as of the date of this letter and as of the date of each transaction we execute with A1, that unless we notify A1 otherwise, we would not be deemed a U.S. Person (as defined in the annex), we will conduct any transaction with A1 as an offshore transaction (as defined in the annex) in accordance with Regulation S as defined by the U.S. Securities and Exchange Commission ("Reg S"), no transaction is a result of directed selling efforts in the U.S. in accordance with Regulation S as defined by the U.S. Securities and Exchange Commission, and we do not and will not use a VPN or other privacy or anonymisation technology to circumvent any geofencing or other restrictions that apply.

Date: January 1, 2026

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22E...



Signed by:

*Jason kahan*

—3E53D61021094D4...

Name:  Jason Kahan

Title:  Jason Kahan

For and on behalf of: Jason Kahan Individual Account

Docusign Envelope ID: 63083738-C284-41E1-BA8F-D0C22ED9CC6D



anchorage
digital

## Annex

"U.S. person" means:

(i) Any natural person resident in the United States;

(ii) Any partnership or corporation organized or incorporated under the laws of the United States;

(iii) Any estate of which any executor or administrator is a U.S. person;

(iv) Any trust of which any trustee is a U.S. person;

(v) Any agency or branch of a foreign entity located in the United States;

(vi) Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

(vii) Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and

(viii) Any partnership or corporation if:

(A) Organized or incorporated under the laws of any foreign jurisdiction; and

(B) Formed by a U.S. person principally for the purpose of investing in securities not registered under the Act, unless it is organized or incorporated, and owned, by accredited investors who are not natural persons, estates or trusts.

"United States" and "U.S." means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

"State" means any State, commonwealth, territory, or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, or the United States Virgin Islands.

Pursuant to Reg S, an "offshore transaction" takes place when the offer is not made to a person in the United States and either the buyer is outside of the United States (or the offeror reasonably believes that the buyer is outside of the United States) or the transaction is executed on an established foreign securities exchange.

# EXHIBIT C – PROPOSAL OF SODA VENTURES

**CONFIDENTIAL & NON-BINDING LETTER OF INTENT**

**Proposed Senior Secured Digital Asset Credit Facility**

**Date:** 1/15/2026

**To:**
Jason M.C. Kahan

23 Sagamore Ln, Boxford MA 01921

This letter of intent (this **"LOI"**) sets forth certain preliminary terms under which **Soda Venture** (the **"Lender"**) may consider providing a senior secured credit facility to **Jason M.C. Kahan** (the **"Borrower"**). This LOI is provided solely for discussion purposes and does **not** constitute a binding commitment, agreement to lend, or obligation of any kind.

**1. Proposed Transaction**

The Lender is evaluating the potential extension of a **senior secured term loan** to the Borrower, collateralized by a portfolio of digital assets (the **"Collateral"**), subject to completion of institutional underwriting, legal diligence, and satisfaction of all conditions described herein.

**2. Indicative Facility Size**

- **Maximum Indicative Loan Amount:**
  **Up to USD $10,000,000**

- **Final Loan Amount:**
  To be determined by the Lender in its sole discretion following completion of underwriting and **shall not exceed fifty percent (50%) loan-to-value ("LTV")** of the verified fair market value of the Collateral.

No assurance is given that the full indicative amount will be approved or funded.

**3. Loan-to-Value Parameters**

- **Maximum LTV:** ≤ 50.0%

- **Valuation Basis:** Institutional pricing methodology selected by Lender (including VWAP or comparable benchmark)

- **Maintenance & Margin:** Subject to customary maintenance thresholds and margin provisions to be documented in definitive agreements

## 4. Collateral & Custody

The loan, if consummated, would be secured by:

- First-priority perfected security interest in approved digital assets
- Assets held in segregated accounts at a **U.S.-regulated digital asset custodian** acceptable to Lender
- Institutional control mechanisms (e.g., multi-signature, dual-control, or equivalent)

No rehypothecation or asset movement shall be permitted without Lender consent.

## 5. Chain of Custody Requirement (Condition to Underwriting)

As a **material condition** to underwriting and any potential extension of credit, the Borrower shall provide a **comprehensive Chain of Custody ("CoC") document**, in form and substance satisfactory to Lender, evidencing:

- Historical provenance of the digital assets
- Wallet addresses and transaction history
- Continuous ownership and control
- Identification of all prior custodians, agents, or intermediaries
- Confirmation of current custody and signatory authority
- Absence of undisclosed liens, claims, or adverse interests

The Lender shall have **no obligation** to proceed with underwriting, valuation, structuring, or documentation unless and until the CoC documentation has been delivered, reviewed, and approved.

## 6. Use of Proceeds

Loan proceeds, if any, may be used for lawful purposes approved by Lender, including but not limited to:

- Working capital
- Litigation, recovery, or professional fees
- Custodial, compliance, and transaction expenses

## 7. Economic Terms (Indicative Only)

All economic terms remain subject to underwriting and definitive documentation, including:

- Interest rate (market-based)

- Origination / structuring fees

- Custody, administration, and pass-through expenses

- Prepayment provisions

**8. Conditions Precedent**

Any potential transaction would be subject to satisfaction of customary conditions, including without limitation:

- Completion of KYC / AML and sanctions screening

- Acceptance of Chain of Custody documentation

- Execution of custody, loan, and security agreements

- Legal opinions (authority, enforceability, perfection)

- No material adverse change

- Any required regulatory or court approvals

**9. Bankruptcy and Court Compliance**

Notwithstanding anything herein to the contrary, any transaction contemplated by this LOI shall be subject in all respects to applicable federal bankruptcy and insolvency laws, including Title 11 of the United States Code, the Federal Rules of Bankruptcy Procedure, and any orders or requirements of a court of competent jurisdiction, including, if applicable, the United States Bankruptcy Court.

If the Borrower is, becomes, or is alleged to be a debtor in any bankruptcy, insolvency, restructuring, or similar proceeding, any proposed transaction shall be conditioned upon, as applicable:

- Receipt of all required court approvals or orders,

- Compliance with automatic stay provisions,

- Confirmation that the transaction does not constitute an avoidable transfer or impermissible post-petition financing, and

3

- Structuring of the transaction in a manner acceptable to Lender and its counsel, including as court-approved financing if required.

Nothing herein shall be deemed a waiver of any rights, defenses, or remedies available to Lender under applicable bankruptcy or insolvency law.

### 10. Governing Law; Bankruptcy Overlay

This LOI shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict-of-laws principles; provided, however, that to the extent any aspect of the proposed transaction is subject to federal bankruptcy jurisdiction, applicable federal bankruptcy law shall govern and control.

### 11. Confidentiality

This LOI and all related communications are confidential and may not be disclosed except to professional advisors or as required by law or court order.

### 12. No Binding Obligation

This LOI is non-binding and does not create any obligation on the part of Lender to proceed with the transaction. No binding agreement or commitment shall exist unless and until definitive documentation is negotiated, executed, and delivered by all parties.

**For the avoidance of doubt, this LOI does not constitute a commitment to provide debtor-in-possession financing, exit financing, or any other court-approved credit.**

### 13. Expiration

This LOI shall expire automatically on **2/16/2026**, unless extended in writing by the Lender.


**Acknowledged and agreed solely as to confidentiality and non-binding provisions:**

Borrower: Jason M.C. Kahan


Name / Title: Custodial Owner
Date: 1/16/2026

**Lender: Soda Venture**

Name: _Song Vanshi_

Title: Partner

Date: 1/17/2026

# EXHIBIT D – PROPOSAL OF WAVE DIGITAL ASSETS

# Beneficial Owners/Controlling Persons Disclosure Form

Name of Investor

## Section A - Legal Entity Investor Classification

Please select applicable option under below Sections 1, 2 or 3 (select only **one** option):

### 1.    Excluded Entities

| | | |
|---|---|---|
| a. | A financial institution regulated by a Federal functional regulator or a bank regulated by a State bank regulator | ○ |
| b. | A department or agency of the United States, of any State, or of any political subdivision of any State | ○ |
| c. | Any entity established under the laws of the United States, of any State, or of any political subdivision of any State, or under an interstate compact between two or more States, that exercises governmental authority on behalf of the United States or any such State or political subdivision | ○ |
| d. | Any entity, other than a bank, whose common stock or analogous equity interests are listed on the New York Stock Exchange or the American Stock Exchange or whose common stock or analogous equity interests have been designated as a NASDAQ National Market Security listed on the NASDAQ Stock Market (except stock or interests listed under the separate "NASDAQ Capital Markets Companies" heading), provided that, for purposes of this paragraph (b)(4), a person that is a financial institution, other than a bank, is an exempt person only to the extent of its domestic operations | ○ |
| e. | Any subsidiary, other than a bank, of any entity described in paragraph (b)(4) of this section (a "listed entity") that is organized under the laws of the United States or of any State and at least 51 percent of whose common stock or analogous equity interest is owned by the listed entity, provided that, for purposes of this paragraph (b)(5), a person that is a financial institution, other than a bank, is an exempt person only to the extent of its domestic operations | ○ |
| f. | An issuer of a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of that Act | ○ |
| g. | An investment company, as defined in section 3 of the Investment Company Act of 1940, that is registered with the Securities and Exchange Commission under that Act | ○ |
| h. | An investment adviser, as defined in section 202(a)(11) of the Investment Advisers Act of 1940, that is registered with the Securities and Exchange Commission under that Act | ○ |
| i. | An exchange or clearing agency, as defined in section 3 of the Securities Exchange Act of 1934, that is registered under section 6 or 17A of that Act | ○ |
| j. | Any other entity registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 | ○ |
| k. | A registered entity, commodity pool operator, commodity trading advisor, retail foreign exchange dealer, swap dealer, or major swap participant, each as defined in section 1a of the Commodity Exchange Act, that is registered with the Commodity Futures Trading Commission | ○ |
| l. | A public accounting firm registered under section 102 of the Sarbanes-Oxley Act | ○ |

| | | |
|---|---|---|
| m. | A bank holding company, as defined in section 2 of the Bank Holding Company Act of 1956 ( 12 U.S.C. 1841) or savings and loan holding company, as defined in section 10(n) of the Home Owners' Loan Act ( 12 U.S.C 1467a(n)) | ○ |
| n. | A pooled investment vehicle that is operated or advised by a financial institution listed in this section A1. | ○ |
| o. | An insurance company that is regulated by a State | ○ |
| p. | A financial market utility designated by the Financial Stability Oversight Council under Title VIII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 | ○ |
| q. | A foreign financial institution established in a jurisdiction where the regulator of such institution maintains beneficial ownership information regarding such institution | ○ |
| r. | A non-U.S. governmental department, agency or political subdivision that engages only in governmental rather than commercial activities | ○ |
| s. | Any legal entity only to the extent that it opens a private banking account subject to § 1010.620 of rules implementing Bank Secrecy Act | ○ |
| t. | A trust (other than a statutory trust created by filing with a Secretary of State or similar officer | ○ |

**Section A1**

If you selected one of the options above in section A1, please proceed to    **Section E**
You do not need to complete any other sections.

**2.    Exempt Entities**

| | | |
|---|---|---|
| a. | A pooled investment vehicle that is operated or advised by a financial institution not excluded under section A1 above | ○ |
| b. | Any legal entity that is established as a nonprofit corporation or similar entity and has filed its organizational documents with the appropriate State authority as necessary | ○ |

**Section A2**

If you selected one of the options above in Section A2, proceed to complete    **Section B and E**
You do not need to complete Section C and D.

**3.    Other Entities**

| | | |
|---|---|---|
| a. | Any other entity such as a corporation, limited liability company, general partnership, or business trust created by filing with a state office | ○ |

**Section A3**

If you selected the above option in section A3, please proceed to complete    **Section B through E**

## Section B - Certification and Identification of the Controlling Person

Please provide below the information for one individual with significant responsibility for managing the legal entity listed in point 1 above, such as:

- an executive officer or senior manager (e.g. Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner,  President, Vice President, Treasurer); or any individual who regularly performs similar functions
- A copy of a current photo identification document, such as driver's license or passport, must be provided for the Controlling Person identified in Section B. A copy of a passport must be provided for any non-US Person identified in Section B.

1.  Name of Controlling Person

2.  Date of Birth                                     Place of Birth (City, Country)

3.  Nationality

4.   Social Security Number or, if non-U.S. Person, Tax Identification Number          Country of Tax Residency

5.  Permanent Residential (Street) Address

## Section C - Certification of Beneficial Owners

Please provide below the information for **each** individual, if any, who directly or indirectly, through any contract, arrangement understanding, relationship or otherwise, owns **25 percent or more** of the equity interest of the legal entity investor.  Provide Section E for each beneficial owner identified here.

## Section D - Identification of Beneficial Owner

This Section D must be completed for each Beneficial Owner identified in section C above.

A copy of a current photo identification document, such as driver's license or passport, must be provided for each Beneficial Owner identified in Section C.  A copy of passport must be provided for each non-US Person identified in Section C.

1.  Name of Investor                                  2.   Name of Beneficial Owner Person

3.  Date of Birth                                     Place of Birth (City, Country)

4.   Nationality

5.  Social Security Number or, if non-U.S. Person, Tax Identification Number          Country of Tax Residency

6.  Permanent Residential (Street) Address

## Section E - Certification and Additional Information

1. Describe nature of Investor's business and source of wealth or income used for this Investment:

I, the undersigned, hereby certify, to the best of my knowledge, that the information provided on all pages of this Beneficial Owners/Controlling Persons Identification Form is correct and complete.

Investor's Signature

Printed Name, Title

Date

# Entity Self-Certification

## Instructions for completion

*We are required pursuant to the Mutual Legal Assistance (Tax Matters) Act, 2003 and Orders and Guidance Notes made thereunder (**implementing legislation**) to collect certain information about the tax arrangements of each account holder and, in some cases, the Controlling Persons of the account holder. These requirements implement intergovernmental agreements (**IGAs**) entered into by the British Virgin Islands in relation to the automatic exchange of information for tax matters (**FATCA**). Please complete the sections below as directed and provide any additional information that is requested. Please note that in certain circumstances (including if we do not receive a valid self-certification from you) we may be obliged to share information on your account with the BVI International Tax Authority.*

*Terms referenced in this form shall have the same meaning as under the relevant IGA and/or implementing legislation.*

*If any of the information below regarding your tax residence or FATCA classification changes in the future, please ensure you advise us of these changes promptly. If you have any questions about how to complete this form, please contact your tax advisor.*

## Section 1: Account Holder Identification

| Account Holder Name | Date of Incorporation/Organization | Country |
|---|---|---|

**Registered Address:**

| Number & Street | City/Town | |
|---|---|---|

| State/Providence/County | Post Code | Country |
|---|---|---|

**Mailing address (if different from above):**

| Number & Street | City/Town | |
|---|---|---|

| State/Providence/County | Post Code | Country |
|---|---|---|

## Section 2: U.S. or United Kingdom Persons

Please tick and complete as appropriate.

(a)     ☐     The entity is a ***Specified U.S. Person*** and the entity's U.S. federal taxpayer identifying number (U.S. TIN) is as follows:

(b)     ☐     The entity is a U.S. Person that is not a Specified U.S. Person. Indicate exemption[1]

---

[1]     Under the US IGA and in the U.S. Internal Revenue Code, Specified US Person does not include: An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37); The United States or any of its agencies or instrumentalities; A state, the District of Columbia, a possession of the United States, or any of their political subdivisions, or instrumentalities; A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i); A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. section 1.1472-1(c)(1)(i); A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state; A real estate investment trust; A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940; A common trust fund as defined in section 584(a); A bank as defined in section 581; A broker; A trust exempt from tax under section 664 or described in section 4947; or A tax-exempt trust under a section 403(b) plan or section 457(g) plan.

1

(c)  ☐  The entity is a **Specified United Kingdom Person** and the entity's United Kingdom identifying tax number is as follows:

_____

(d)  ☐  The entity is a United Kingdom Person that is not a Specified United Kingdom Person.  Indicate exemption[2]

_____

**Complete Section 3 if the entity has non-U.S. or non-UK tax residencies.**

## Section 3: Declaration of Tax Residency (other than U.S. or U.K.)

Please indicate the entity's place of tax residence (if resident in more than one country please detail all countries and associated tax reference number types and numbers).

| Country/ countries of tax residency | Tax reference number type | Tax reference number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

## Section 4: Entity FATCA Classification

**4.1**  If you are a **Registered Financial Institution,** please tick one of the below categories, and provide your *FATCA GIIN at 4.1.1.*

(a)  ☐  British Virgin Islands or IGA Partner Jurisdiction Financial Institution
(b)  ☐  Registered Deemed Compliant Foreign Financial Institution
(c)  ☐  Participating Foreign Financial Institution

4.1.1 Please provide your *Global Intermediary Identification number (GIIN):*

_____

**4.2**  If you are a **Financial Institution but unable to provide a GIIN**, please tick one of the below reasons:

(a)  ☐  The entity is a Sponsored Financial Institution and has not yet obtained a GIIN but is sponsored by another entity that has registered as a Sponsoring Entity.  Please provide the Sponsoring Entity's name and GIIN.

_____

Sponsoring Entity's Name                    Sponsoring Entity's GIIN

_____

[2]  Under the UK IGA, Specified UK Person does not include: A corporation the stock of which is regularly traded on one or more established securities markets or a member of the same EAG; A depository Institution; A broker or dealer in securities, commodities, or derivative financial instruments that is registered as such under the laws of the United Kingdom; or a Non-Reportable United Kingdom Entity as defined in Annex II paragraph V.

2

(b)    ☐    The entity is a Trustee Documented Trust.  Please provide your Trustee's name and GIIN.

_____    _____
Trustee's Name                                          Trustee's GIIN

(c)    ☐    The entity is a Certified Deemed Compliant, or otherwise Non-Reporting, Foreign Financial Institution (including a Foreign Financial Institution deemed compliant under Annex II of an IGA, except for a Trustee Documented Trust or Sponsored Financial Institution). Indicate exemption:

_____

(d)    ☐    The entity is an Excepted Foreign Financial Institution.  Indicate exemption:

_____

(e)    ☐    The entity is a Non-Participating Foreign Financial Institution

(f)    ☐    The entity is a US Financial Institution

**4.3**  If you are not a Foreign Financial Institution, please confirm the entity's FATCA status below:

(a)    ☐    The entity is an *Exempt Beneficial Owner* Indicate status:

_____

(b)    ☐    The entity is an *Active Non-Financial Foreign Entity* (including an Excepted NFFE)

(c)    ☐    The entity is a *Passive Non-Financial Foreign Entity* (please complete table in below providing details of any *Controlling Persons[3]*)

| Full Name | Date of Birth | Full residence address | Details of controlling person's beneficial interest* | Country(ies) of tax residence | Tax reference type and number |
|-----------|---------------|------------------------|-----------------------------------------------------|-------------------------------|-------------------------------|
|           |               |                        |                                                     |                               |                               |
|           |               |                        |                                                     |                               |                               |
|           |               |                        |                                                     |                               |                               |

## Section 5: Declaration and Undertakings

I/We declare (as an authorised signatory of the entity) that the information provided in this form about the entity (and, if applicable, its Controlling Persons) is, to the best of my/our knowledge and belief, accurate and complete.  I/We undertake to advise the recipient promptly and provide an updated Self-Certification form within 30 days where any change in circumstances occurs which causes any of the information contained in this form to be inaccurate or incomplete.  Where legally obliged to do so, I/we hereby consent to the recipient sharing this information with the relevant tax information authorities.

_____    _____
Authorised Signature                                   Authorised Signature

_____    _____
Position/Title                                         Position/Title

_____    _____
Date: (dd/mm/yy)                                       Date: (dd/mm/yy)

_____

[3]    Means the natural persons who exercise control over an Entity.  For companies and similar legal persons, it depends on the ownership structure of the company (or legal person) and will include any natural person owning (directly or indirectly) 25% or more of the company (or legal person). For trusts and other similar legal arrangements, it will include the settlor, the trustee(s), the protector (if any), the beneficiaries, and any other natural person exercising ultimate effective control over the trust. .

3

For the purposes of determining the Controlling Persons of an Account Holder the AML laws of the Virgin Islands must be applied. That means that there is a 10% threshold for a controlling ownership interest of a legal person (NOT 25%).

# Entity Self-Certification (BVI)

### *Instructions for completion*

*We are required pursuant to the Mutual Legal Assistance (Tax Matters) Act, 2003 and its amendments (namely the Mutual Legal Assistance (Tax Matters) (Amendment)(No. 2) Act, 2015  and any Orders and Guidance Notes made thereunder (**implementing legislation**) to collect certain information about the tax arrangements of each account holder and, in some cases, the Controlling Persons of the account holder. These requirements implement the Common Reporting Standards (**CRS**) which requires the automatic exchange of information for tax matters.  Please complete the sections below as directed and provide any additional information that is requested.  Please note that in certain circumstances (including if we do not receive a valid self-certification from you) we may be obliged to share information on your account with the BVI International Tax Authority.*

*Terms referenced in this form shall have the same meaning as under the CRS and/or implementing legislation. If any of the information below regarding your tax residence or CRS classification changes in the future, please ensure you advise us of these changes promptly. While completing this form please see the definitions in Annex 1 to the form and If you have any questions about how to complete this form, please contact your tax advisor.*

## Section 1: Account Holder Identification

_____

Name of Entity/Branch

_____

| Account Holder Name | Date of Incorporation/Organization | Country of Incorporation/Organization |

**Registered Address:**

_____

| Number & Street | City/Town |

_____

| State/Providence/County | Post Code | Country |

**Mailing address (if different from above):**

_____

| Number & Street | City/Town |

_____

| State/Providence/County | Post Code | Country |

## Section 2: Common Reporting Standard

Please indicate the Entity's place of tax residence (if resident in more than one country please detail all countries and associated tax reference number type and number). Please indicate not application if the jurisdiction does not issue or if you are unable to procure a tax reference number or functional equivalent.

| Country/ countries of tax residency | Tax reference number type | Tax reference number |
|---|---|---|
|  |  |  |
|  |  |  |

1

| | | |
|---|---|---|
| | | |

If applicable, please specify the reason for non-availability of a tax reference number:

_____

## Section 3: CRS Classification

Provide your CRS classification by checking the corresponding box(es). Note that your CRS classification does not necessarily coincide with your classification for US or UK FATCA purposes.

**3.1** If you are a *Financial Institution,* please tick one of the below categories.

(a)　　☐　Reporting Financial Institution under CRS

(b)　　☐　Non-Reporting Financial Institution under CRS, Specify the type of Non-Reporting Financial Institution below:

　　　　　☐　Governmental Entity
　　　　　☐　International Organization
　　　　　☐　Central bank
　　　　　☐　Broad Participation Retirement Fund
　　　　　☐　Narrow Participation Retirement Fund
　　　　　☐　Pension Fund of a Governmental Entity, International Organization, or Central Bank
　　　　　☐　Exempt Collective Investment Vehicle
　　　　　☐　Trust whose trustee reports all required information with respect to all CRS Reportable Accounts
　　　　　☐　Qualified Credit Card Issuer
　　　　　☐　Other Entity defined under the domestic law as low risk of being used to evade tax.
　　　　　　　Specify the type provided in the domestic law:

　　　　　_____

(c)　　☐　If you are a *Financial Institution resident in a Non-Participating Jurisdiction* under CRS, please specify the type of Financial Institution resident in a Non-Participating jurisdiction below:

　　　　　☐　Investment Entity and managed by another Financial Institution.
　　　　　If you have ticked this box please indicate the name of the Controlling Person(s). Please refer to the definition of Controlling Person in Annex 1.

| Full Name of any Controlling Person(s) | (must not be left blank) |
|---|---|
| | |
| | |
| | |

　　　　　Please also complete Section 5 below providing further details of any ultimate Controlling Persons who are natural persons.

　　　　　☐　Other Investment Entity
　　　　　☐　Other Financial Institution, including a Depositary Financial Institution, Custodial Institution, or Specified Insurance Company.

**3.2** If you are an *Active Non-Financial Entity ("NFE")* please specify the type of NFE below:

(a)　　☐　Corporation that is regularly traded or a related entity of a regularly traded corporation.

　　　　　Provide the name of the stock exchange where traded:

　　　　　_____

　　　　　If you are a related entity of a regularly traded corporation, provide the name of the regularly traded corporation:

2

(b)  ☐  Government entity, International Organisation, a Central Bank, or an Entity wholly owned by one or more of the foregoing

(c)  ☐  Other Active Non-Financial Foreign Entity.

**3.3**  If you are a **Passive Non-Financial Entity** please indicate the name of the Controlling Person(s).

| Full Name of any Controlling Person(s) | (must not be left blank) |
|---|---|
|  |  |
|  |  |
|  |  |

## Section 4: Declaration and Undertakings

I/We declare (as an authorised signatory of the entity) that the information provided in this form about the entity (and, if applicable, its Controlling Persons) is, to the best of my/our knowledge and belief, accurate and complete.  I/We undertake to advise the recipient promptly and provide an updated Self-Certification form within 30 days where any change in circumstances occurs which causes any of the information contained in this form to be inaccurate or incomplete.  Where legally obliged to do so, I/we hereby consent to the recipient sharing this information with the relevant tax information authorities.

_____        _____
Authorised Signature                                Authorised Signature

_____        _____
Position/Title                                            Position/Title

_____        _____
Date: (dd/mm/yy)                                      Date: (dd/mm/yy)

## Section 5 – Identification of a Controlling Person

**5.1**  Name of Controlling Person:

_____
Family Name or Surname(s)          First or Given Name:                        Middle Names(s)

**5.2**  Current Residence Address:

_____
Line 1 (e.g. House/Apt/Suite        Line 2 (e.g. Town/ City/          Country:                    Post Code/Zip Code:
Name, Number, Street)                Province/County/State)

**5.3**  Mailing Address: (if different from Current Residence Address)

_____
Line 1 (e.g. House/Apt/Suite        Line 2 (e.g. Town/ City/          Country:                    Post Code/Zip Code:
Name, Number, Street)                Province/County/State)

**5.4**  Date and Country of Birth

_____
Date of Birth (dd/mm/yyyy)          Town/City of Birth                Country of Birth

3

**5.5**  Legal name of the relevant entity Account Holder(s) of which you are a Controlling Person

Legal name of Entity 1    _____

Legal name of Entity 2    _____

Legal name of Entity 3    _____


## Section 6 – Country of Residence for Tax Purposes and related Taxpayer Reference Number or functional equivalent ("TIN")

Please complete the following table indicating:

(i) where the Controlling Person is tax resident;
(ii) the Controlling Person's TIN for each country indicated; and,
(iii) if the Controlling Person is a tax resident in a country that is a Reportable Jurisdiction(s) then please also complete Section 7 "Type of Controlling Person".

If the Controlling Person is tax resident in more than three countries please use a separate sheet

|   | Country/countries of tax residency | Tax reference number type | Tax reference number (e.g. TIN) |
|---|---|---|---|
| 1 |  |  |  |
| 2 |  |  |  |
| 3 |  |  |  |

If applicable, please specify the reason for non-availability of a tax reference number:
_____


## Section 7 – Type of Controlling Person
(Please only complete this section if you are tax resident in one or more Reportable Jurisdictions)

| Please provide the Controlling Person's Status by ticking the appropriate box. | Entity 1 | Entity 2 | Entity 3 |
|---|---|---|---|
| a.  Controlling Person of a legal person – control by ownership |  |  |  |
| b.  Controlling Person of a legal person – control by other means |  |  |  |
| c.  Controlling Person of a legal person – senior managing official |  |  |  |
| d.  Controlling Person of a trust – settlor |  |  |  |
| e.  Controlling Person of a trust – trustee |  |  |  |
| f.  Controlling Person of a trust – protector |  |  |  |
| g.  Controlling Person of a trust – beneficiary |  |  |  |
| h.  Controlling Person of a trust – other |  |  |  |
| i.  Controlling Person of a legal arrangement (non-trust) – settlor-equivalent |  |  |  |
| j.  Controlling Person of a legal arrangement (non-trust) – trustee-equivalent |  |  |  |
| k.  Controlling Person of a legal arrangement (non-trust) – protector-equivalent |  |  |  |
| l.  Controlling Person of a legal arrangement (non-trust) – beneficiary-equivalent |  |  |  |
| m.  Controlling Person of a legal arrangement (non-trust) – other-equivalent |  |  |  |

4

### Section 8: Controlling Person Declaration and Undertakings

I acknowledge that the information contained in this form and information regarding the Controlling Person and any Reportable Account(s) may be reported to the tax authorities of the country in which this account(s) is/are maintained and exchanged with tax authorities of another country or countries in which [I/the Controlling Person] may be tax resident pursuant to international agreements to exchange financial account information.

I certify that I am the Controlling Person, or am authorised to sign for the Controlling Person, of all the account(s) held by the entity Account Holder to which this form relates.

I declare that all statements made in this declaration are, to the best of my knowledge and belief, correct and complete.

I undertake to advise the recipient within 30 days of any change in circumstances which affects the tax residency status of the individual identified in Part 1 of this form or causes the information contained herein to become incorrect, and to provide the recipient with a suitably updated self-certification and Declaration within 30 days of such change in circumstances.

_____
Signature

_____
Print Name

_____
Date: (dd/mm/yy)

Note: If you are not the Controlling Person please indicate the capacity in which you are signing the form. If signing under a power of attorney please also attach a certified copy of the power of attorney.

Capacity: _____

Annex 1

**CRS DEFINITIONS**

*Account Holder* means the person listed or identified as the holder of a Financial Account by the Financial Institution that maintains the account. A person, other than a Financial Institution, holding a Financial Account for the benefit or account of another person as agent, custodian, nominee, signatory, investment advisor, or intermediary, is not treated as holding the account for purposes of the Common Reporting Standard, and such other person is treated as holding the account. In the case of a Cash Value Insurance Contract or an Annuity Contract, the Account Holder is any person entitled to access the Cash Value or change the beneficiary of the contract. If no person can access the Cash Value or change the beneficiary, the Account Holder is any person named as the owner in the contract and any person with a vested entitlement to payment under the terms of the contract. Upon the maturity of a Cash Value Insurance Contract or an Annuity Contract, each person entitled to receive a payment under the contract is treated as an Account Holder.

*Active Non-Financial Entity* means any NFE that meets any of the following criteria:

a) less than 50% of the NFE's gross income for the preceding calendar year or other appropriate reporting period is passive income and less than 50% of the assets held by the NFE during the preceding calendar year or other appropriate reporting period are assets that produce or are held for the production of passive income;

b) the stock of the NFE is regularly traded on an established securities market or the NFE is a Related Entity of an Entity the stock of which is regularly traded on an established securities market;

c) the NFE is a Governmental Entity, an International Organisation, a Central Bank, or an Entity wholly owned by one or more of the foregoing;

d) substantially all of the activities of the NFE consist of holding (in whole or in part) the outstanding stock of, or providing financing and services to, one or more subsidiaries that engage in trades or businesses other than the business of a Financial Institution, except that an Entity does not qualify for this status if the Entity functions (or holds itself out) as an investment fund, such as a private equity fund, venture capital fund, leveraged buyout fund, or any investment vehicle whose purpose is to acquire or fund companies and then hold interests in those companies as capital assets for investment purposes;

e) the NFE is not yet operating a business and has no prior operating history, but is investing capital into assets with the intent to operate a business other than that of a Financial Institution, provided that the NFE does not qualify for this exception after the date that is 24 months after the date of the initial organisation of the NFE;

f) the NFE was not a Financial Institution in the past five years, and is in the process of liquidating its assets or is reorganising with the intent to continue or recommence operations in a business other than that of a Financial Institution;

g) the NFE primarily engages in financing and hedging transactions with, or for, Related Entities that are not Financial Institutions, and does not provide financing or hedging services to any Entity that is not a Related Entity, provided that the group of any such Related Entities is primarily engaged in a business other than that of a Financial Institution; or

h) the NFE meets all of the following requirements:

    i) it is established and operated in its jurisdiction of residence exclusively for religious, charitable, scientific, artistic, cultural, athletic, or educational purposes; or it is established and operated in its jurisdiction of residence and it is a professional organisation, business league, chamber of commerce, labour organisation, agricultural or horticultural organisation, civic league or an organisation operated exclusively for the promotion of social welfare;

    ii) it is exempt from income tax in its jurisdiction of residence;

    iii) it has no shareholders or members who have a proprietary or beneficial interest in its income or assets;

    iv) the applicable laws of the NFE's jurisdiction of residence or the NFE's formation documents do not permit any income or assets of the NFE to be distributed to, or applied for the benefit of, a private person or non- charitable Entity other than pursuant to the conduct of the NFE's charitable activities, or as payment of reasonable compensation for services rendered, or as payment representing the fair market value of property which the NFE has purchased; and

    v) the applicable laws of the NFE's jurisdiction of residence or the NFE's formation documents require that, upon the NFE's liquidation or dissolution, all of its assets are distributed to a Governmental Entity or other non-profit organisation, or escheat to the government of the NFE's jurisdiction of residence or any political subdivision thereof.

*Controlling Person* means the natural persons who exercise direct or indirect control over an entity. In the case of a trust, such term means the settlor(s), the trustees(s), the protector(s) (if any), the beneficiary(ies) or class(es) of beneficiaries, and any other natural person(s) exercising ultimate effective control over the trust, and in the case of a legal arrangement other than a trust, such term means persons in equivalent or similar positions. The term 'Controlling Persons' shall be interpreted in a manner consistent with the Financial Action Task Force Recommendations ("FATF").

FATF Recommendations on Controlling Persons:
Identify the beneficial owners of the customer and take reasonable measures to verify the identity of such persons, through the following information. For legal persons[1]:

---

[1] Measures (a) to (b) are not alternative options, but are cascading measures, with each to be used where the previous measure has been applied and has not identified a beneficial owner.

(a)  The identity of the natural persons (if any – as ownership interests can be so diversified that there are no natural persons (whether acting alone or together) exercising control of the legal person or arrangement through ownership) who ultimately have a controlling ownership interest[2] in a legal person; and

(b)  to the extent that there is doubt under (a) as to whether the person(s) with the controlling ownership interest are the beneficial owner(s) or where no natural person exerts control through ownership interests, the identity of the natural persons (if any) exercising control of the legal person or arrangement through other means.

(c)  Where no natural person is identified under (a) or (b) above, financial institutions should identify and take reasonable measures to verify the identity of the relevant natural person who holds the position of senior managing official.

*Financial Institution* means a Custodial Institution, a Depository Institution, an Investment Entity, or a Specified Insurance Company, where:

(a)  *Custodial Institution* means any entity that holds, as a substantial portion of its business, financial assets for the account of others. An entity holds financial assets for the account of others as a substantial portion of its business if the entity's gross income attributable to the holding of financial assets and related financial services equals or exceeds 20 percent of the Entity's gross income during the shorter of: (i) the three-year period that ends on 31 December (or the final day of a non-calendar year accounting period) prior to the year in which the determination is being made; or (ii) the period during which the entity has been in existence;

(b)  *Depository Institution* means any entity that accepts deposits in the ordinary course of a banking or similar business;

(c)  *Investment Entity* means any entity :
   (A)  that primarily conducts as a business one or more of the following activities or operations for or on behalf of a customer:
      i)  trading in money market instruments (cheques, bills, certificates of deposit, derivatives, etc.); foreign exchange; exchange, interest rate and index instruments; transferable securities; or commodity futures trading;
      ii)  individual and collective portfolio management; or
      iii)  otherwise investing, administering, or managing Financial Assets or money on behalf of other persons; or
   (B)  the gross income of which is primarily attributable to investing, reinvesting, or trading in Financial Assets, if the entity is managed by another entity that is a Depository Institution, a Custodial Institution, a Specified Insurance Company, or an Investment Entity described in limb (A) of this definition.

   An entity is treated as primarily conducting as a business one or more of the activities described in limb (A), or an entity's gross income is primarily attributable to investing, reinvesting, or trading in Financial Assets for purposes of limb (B) if the entity's gross income attributable to the relevant activities equals or exceeds 50% of the entity's gross income during the shorter of: (i) the three-year period ending on 31 December of the year preceding the year in which the determination is made; or (ii) the period during which the entity has been in existence. The term "Investment Entity" does not include an entity that is an Active Non-Financial Foreign Entity because it meets any of the criteria in subparagraphs d) through (g) of the definition of Active NFE.

   The preceding paragraph shall be interpreted in a manner consistent with similar language set forth in the definition of "financial institution" in the Financial Action Task Force Recommendations; and

(d)  *Specified Insurance Company* means any entity that is an insurance company (or the holding company of an insurance company) that issues, or is obligated to make payments with respect to, a Cash Value Insurance Contract or an Annuity Contract.

*Non-Financial Entity* or *NFE* means any Entity that is not a Financial Institution.

*Non-Participating Jurisdiction* means a jurisdiction that is not a Participating Jurisdiction.

*Non-Reporting Financial Institution* means any Financial Institution that is:

(a)  a Governmental Entity, International Organisation or Central Bank, other than with respect to a payment that is derived from an obligation held in connection with a commercial financial activity of a type engaged in by a Specified Insurance Company, Custodial Institution, or Depository Institution;

(b)  a Broad Participation Retirement Fund; a Narrow Participation Retirement Fund; a Pension Fund of a Governmental Entity, International Organisation or Central Bank; or a Qualified Credit Card Issuer;

(c)  any other Entity that presents a low risk of being used to evade tax, has substantially similar characteristics to any of the Entities described in subparagraphs B(1)(a) and (b), and is defined in domestic law as a Non-Reporting Financial Institution, provided that the status of such Entity as a Non-Reporting Financial Institution does not frustrate the purposes of the Common Reporting Standard;

(d)  an Exempt Collective Investment Vehicle; or

(e)  a trust to the extent that the trustee of the trust is a Reporting Financial Institution and reports all information required to be reported pursuant to Section I with respect to all Reportable Accounts of the trust.

*Participating Jurisdiction* means a jurisdiction (i) with which an agreement is in place pursuant to which it will provide the information specified in Section I (of the CRS), and (ii) which is identified in a published list.

---

[2] A controlling ownership interest depends on the ownership structure of the company. It may be based on a threshold, e.g. any person owning more than a certain percentage of the company (e.g. 10%).

*Participating Jurisdiction Financial Institution* means (i) any Financial Institution that is resident in a Participating Jurisdiction, but excludes any branch of that Financial Institution that is located outside such Participating Jurisdiction, and (ii) any branch of a Financial Institution that is not resident in a Participating Jurisdiction, if that branch is located in such Participating Jurisdiction.

*Passive Non-Financial Entity* means any: (i) Non-Financial Entity that is not an Active Non-Financial Entity; or (ii) an Investment Entity described in limb B (or subparagraph A(6)(b) of the Standard) of the definition of Investment Entity that is not a Participating Jurisdiction Financial Institution.

*Related Entity* means an entity related to another entity because (i) either entity controls the other entity; (ii) the two entities are under common control; or (iii) the two entities are Investment Entities described limb B of the definition of Investment Entity, are under common management, and such management fulfils the due diligence obligations of such Investment Entities. For this purpose, control includes direct or indirect ownership of more than 50 % of the vote and value in an Entity.

8

# EXHIBIT E – CHAIN OF BITCOIN CUSTODY FOR EXECUTION BY COURT

## CHAIN OF CUSTODY

*Transfer Flow of Assets*
*United States Bankruptcy Court District of Massachusetts*
*Jason M. Kahan, Debtor*
*Chapter 7, Case No. 24-11592-JEB*

1. Source (Compromised) BTC Address(es)
   - BTC Address #1 (being swept):       bc1qlzxjh5tcn3jesdyxtvgl9ykxt2tzlzdefzl0hz
   - BTC Address #2 (being swept):       bc1q2lvegcyxx8rnzmmr04up0ja6642r3cgtg659df
   - BTC Address #3 (being swept):       bc1qw29r6t7u500uffxe2584f7uvxytwv3v4xzej6c
   - BTC Address #4 (being swept):       bc1qapqrszqeyl2kc2v45nmnkt33luphjaah7ayrlk
   - BTC Address #5 (being swept):       bc1quuwpv6wapsqdq237l97xp6e5mpp66pph74gx4x
   - BTC Address #6 (being swept):       bc1qu2pp66jxlt3af4fts8kgj5358x7kyscz3zqssr

2. Primary Obligations
   - Amount & BTC Address:
     - Name:            Federal Trustee Wallet
     - Address:         bc1qmt3z4sapg4v0u37lyycwe29cj4t39900nxxrlc
     - Amount:          60

3. Ultimate Destination
   - Client's New Wallet Address(es) (Jason Kahan)
     - Address #1:      bc1qnyp6xlrqnyczeada8pyjcjm6jpsxxyp2p83uew
     - Address #2:      Anchorage Digital Addresses to be concluded on week of 1/19/26
     - Amount:          All remaining BTC

- Jason M. Kahan, Debtor, will comply with any court ordered holds on the movement of assets (from 3. Ultimate Destination) as necessary without restriction or exemption.
- Jason M. Kahan, Debtor, and any related consultants or claims are subordinated and compelled to abide by the transfer flow of assets as scheduled in this Chain of Custody letter.
- Any and all amendments or changes to this transfer flow of assets has to be mutually agreed upon by all signing parties.

Signatures

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date first written above.

Janet E. Bostwick
United States Bankruptcy Judge

Signature:

Date:

Debtor: Jason Kahan (Individual)

Signature:

Date:

- BTC Address #1 (being swept) 500 BTC: bc1qlzxjh5tcn3jesdyxtvgl9ykxt2tzlzdefzl0hz
- BTC Address #2 (being swept) 415 BTC: bc1q2lvegcyxx8rnzmmr04up0ja6642r3cgtg659df
- BTC Address #3 (being swept) 494 BTC: bc1qw29r6t7u500uffxe2584f7uvxytwv3v4xzej6c
- BTC Address #4 (being swept) 185 BTC: bc1qapqrszqeyl2kc2v45nmnkt33luphjaah7ayrlk
- BTC Address #5 (being swept) 100 BTC: bc1quuwpv6wapsqdq237l97xp6e5mpp66pph74gx4x
- BTC Address #6 (being swept) 100 BTC: bc1qu2pp66jxlt3af4fts8kgj5358x7kyscz3zqssr

Total BTC Remaining: 1795 BTC