**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

In re:

JASON M. KAHAN,

                    Debtor.

Chapter 7

Case No. 24-11592-JEB

**IRONWOOD RECOVERY HOLDINGS LLC'S RESPONSE IN SUPPORT OF ITS BID**

Ironwood Recovery Holdings LLC ("Ironwood"), by and through its undersigned counsel, hereby submits this response (this "Response") in support of its Bid [Docket No. 289] and in response to the *Chapter 7 Trustee's Objection to the Designation of the Bid Submitted by Ironwood Recovery Holdings LLC as Qualified Bid* [Docket No. 298] (the "Trustee Objection") and the *Objection of PBTC Recovery Partners, LLC to the Designation of the Bids of Ironwood Recovery Holdings LLC and Samara CR Holdings, LLC as Qualified Bids* [Docket No. 297] (the "Stalking Horse Objection," and together, the "Objections")[1]. In support, Ironwood respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      This is the Trustee's sale and the Trustee must take an active role in maximizing the value of the Debtor's estate for the benefit of all stakeholders.  Yet, just two days before the Sale Hearing, the Court expressed concern with the Trustee's role in the sale process, stating that it was "a little troubled by such a hands-off attitude." Hr'g Tr. 10:4. Hours later, the Trustee found his voice — not to advance the estate, but to try to disqualify the highest bid before it.

---

[1]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Sale Procedures Order, the Bid, or the Objections, as applicable.

2.      That concern did not arise in a vacuum. The Trustee did not know that approximately 494 Bitcoin — roughly 28% of the estate's Bitcoin — had left an estate wallet until a bidder told him; he represented that he had taken *no* steps to investigate or recover it and was aware of none to take; and he offered *no* position on the motion to investigate that very disappearance. For much of this case, the estate's fiduciary has been a spectator to it.

3.      The Trustee's passivity did not end there. When Ironwood came forward with a higher and better competing bid, the Trustee refused to engage. He rejected every proposed change to the form APA, and when Ironwood asked him to discuss any of those changes on the merits, he responded that he was unwilling to accept anything. Ironwood even asked a basic question — whether the Stalking Horse APA would permit the Stalking Horse Bidder to use this Court to pursue the estate's claims — and the Trustee's only answer was that "the APA speaks for itself." The one thing that speaks for itself is that the Trustee has abandoned his fiduciary duty to maximize value for creditors.

4.      Now two objections — one from the Trustee, one from the Stalking Horse Bidder — arrive together, and both rest on a single technicality: that the Bid is not in "substantially the same form" as the $350,000 Stalking Horse APA. The Trustee and the Stalking Horse Bidder — despite their very different roles in the sale process — seek the same result: exclusion of a higher and better bid from the auction.

5.      The Sale Procedures were "designed to maximize recovery," and direct the Trustee to accept the "highest or otherwise best" bid.  Ironwood's Bid offers $500,000 in cash, *plus* a waterfall that returns recoveries to creditors up to payment of their claims in full, with Ironwood (not the estate) funding and bearing the risk of that litigation.  The Stalking Horse Bidder offers

$350,000 and nothing more — no share of any recovery on the Recovery Actions for the estate's creditors.

6.      The Trustee's refusal to engage has chilled bidding by making clear that even a materially superior bid may be met not with evaluation, but with obstruction.  The auction process should not be used to protect the Stalking Horse Bidder from competition or to give the Trustee an exit ramp from his duty to evaluate a bid that offers materially greater value to the estate. The point of an auction is to test the market, maximize value, and let qualified bidders compete. Ironwood's Bid does exactly that. Ironwood files this Response to place that record before the Court. Ironwood has invested considerable resources in this process, but it will not continue to expend those resources in a process the Trustee has declined to advance. Accordingly, Ironwood does not intend, at this time, to participate in the Auction or Sale Hearing. Ironwood is open to discussing its Bid with the Trustee or any party in interest should they wish to pursue it.

**BACKGROUND**

7.      On August 7, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code, commencing the above-captioned case. On August 8, 2024, Donald Lassman (the "Trustee") was appointed as the Chapter 7 Trustee in the Case.

8.      On May 8, 2026, the Trustee filed *Trustee's Motion for Entry of an Order Approving Procedures Governing the Proposed Sale of Certain of the Debtor's Assets Pursuant to Section 363 of the  Bankruptcy Code* [Docket No. 260] (the "Sale Motion").

9.      On June 3, 2026, the Court entered the *Order (A) Approving Procedures Governing Trustee's Proposed Sale of Certain of the Debtor's Assets Pursuant to Section 363 of the Bankruptcy Code, Free And Clear of Liens, Claims, Encumbrances and Other Interests,*

3

*(B) Approving Form and Manner of Notice of Sale, and (C) Granting Related Relief* [Docket No. 274] (the "Sale Procedures Order").

10. Pursuant to the Sale Procedures Order, Pioneer Funding Group LLC ("Pioneer") was named the designated Stalking Horse Bidder under an Asset Purchase Agreement dated May 6, 2026 (the "APA").

11. On June 26, 2026, Pioneer gave notice that it had assigned all of its rights and obligations as Buyer under the APA to PBTC Recovery Partners, LLC ("PBTC"), with the Trustee's written consent [Docket No. 284]. PBTC is now the Stalking Horse Bidder. Pioneer and PBTC are referred to herein, as applicable, as the "Stalking Horse Bidder."

12. On June 26, 2026, Ironwood timely submitted its Bid in accordance with the Sale Procedures Order [Docket No. 289]. Its principal terms are: (a) a Purchase Price of $500,000 in cash payable to the Trustee for the estate at closing; (b) acquisition of the "Purchased Rights" — the sole and exclusive standing to prosecute the Recovery Actions (as agent of, and on derivative standing for, the Trustee and the estate); and (c) a covenant to distribute the net proceeds of the Recovery Actions through a waterfall that pays Ironwood's litigation costs first, then returns to the estate up to 50% of net proceeds (capped at the lesser of $5 million or payment of all allowed claims in full), with any distribution to the Debtor occurring only from surplus after all allowed claims are paid in full and only upon a court-tested showing of substantial contribution.

13. On June 29, 2026, the Trustee and the Stalking Horse Bidder each objected to the qualification of the Bid. Both contend the Bid is not in "substantially the same form" as the Stalking Horse APA. *See* Trustee Obj. ¶¶ 9–12; Stalking Horse Obj. ¶¶ 5–7.

## RESPONSE

**I.     The Sale Procedures Require Substantial Conformity, Not Strict Adherence to the Stalking Horse APA.**

14.     The Sale Procedures require substantial conformity, not identical terms.  Indeed, the Sale Procedures specifically instruct competing bidders to submit an "APA in substantially the same *form*," and, in the very same sentence, direct bidders to submit "any proposed changes marked in a blackline." *See* Sale Procedures ¶ 4(a).  Changes are thus expressly invited; that is what an overbid is. To read "substantially the same form" to require a competing bidder to mirror the Stalking Horse Bidder's structure and deal terms would render the blackline process meaningless and reduce the auction to a rubber stamp of the Stalking Horse Bidder's APA.

15.     The Sale Procedures should be read to promote, not suppress, competitive bidding. Ironwood's proposed changes do not defeat substantial conformity; they reflect the very improvements a value-maximizing auction is intended to solicit. Because Ironwood submitted a bid in substantially the same form and disclosed its proposed modifications, disqualification on this basis would be inconsistent with both the text and purpose of the Sale Procedures. That conclusion is only reinforced by the Trustee's own conduct: rather than engage with the blacklined changes the Sale Procedures expressly invite, and that the basic tenets of a competitive auction require, the Trustee refused to discuss any of them on the merits and took the position that he would not accept anything.  These actions have chilled bidding, undermined the auction process, and left bidders like Ironwood in an untenable position.

**II.     Ironwood's Bid Is the Highest and Best Offer, and Approving It Serves the Best Interests of the Estate.**

16.     The touchstone of any sale under Section 363 is value maximization for the estate. A trustee's overriding duty in such a sale is "to obtain the highest price or greatest overall benefit

5

possible for the estate." *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). For that reason, courts require a competitive auction to secure the "highest and best" offer for estate assets. *See In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010); *In re GSC, Inc.*, 453 B.R. 132, 169 (Bankr. S.D.N.Y. 2011).

17.     On price alone, Ironwood's Bid is the highest. Ironwood offers $500,000 in cash — $150,000 (roughly 43%) more than the Stalking Horse Bidder's $350,000 floor, and well above the $415,500 minimum overbid the Court set.   Thus, measured by cash consideration alone, Ironwood's Bid is plainly higher than the Stalking Horse Bidder's offer.

18.     Ironwood's Bid is also the "otherwise best" offer because it delivers the "greatest overall benefit" to the estate. *Atlanta Packaging,* 99 B.R. at 131. The $500,000 is paid in cash to the estate at closing, free of any financing or diligence contingency. On top of that fixed consideration, Ironwood's recovery waterfall returns value to creditors up to payment of their allowed claims in full, with Ironwood, not the estate, funding the litigation and bearing the risk, and asks nothing of the Trustee, who is required to perform none of the work. The estate therefore receives more cash today and a share of an upside it could not realize on its own or under the Stalking Horse Bid, at no cost and no risk to creditors. The Stalking Horse Bidder, by contrast, offers the least cash, captures none of that upside for the estate, and returns nothing to creditors beyond its fixed price. Whether the Court measures by price or by overall benefit, Ironwood's Bid is the superior one.

19.     Disqualifying Ironwood's Bid on a "same form" technicality would invert the Trustee's duty. A trustee may value the certainty or speed of the Stalking Horse Bid, but neither speed nor a drafting preference can displace the paramount obligation to obtain the greatest recovery for creditors. The estate's interest lies with the bid that pays more and shares the

6

recoveries, not the one that pays least and shares nothing further with creditors. Accordingly, Ironwood's Bid should be deemed a Qualified Bid, and Ironwood should be permitted to compete at auction. That result is compelled by the Sale Procedures, the "highest or otherwise best" standard, and the Trustee's fiduciary duty to maximize value.

**III.     The Structural Difference Between Ironwood's Bid and the Stalking Horse APA Is Precisely What Maximizes Recovery.**

20.     The most important difference between Ironwood's Bid and the Stalking Horse APA is structural, and it is the very reason Ironwood's Bid delivers more value to the estate. The Stalking Horse Bidder proposes to acquire the Assets outright and close. Ironwood does not. Ironwood acquires the sole and exclusive right to prosecute the Recovery Actions as agent of, and on derivative standing for, the Trustee and the estate, and the estate remains open so that the claims can be pursued in this Court — with Ironwood, not the estate, bearing the cost of keeping the estate open and funding the litigation.

21.     That structure is deliberate, and its purpose is decisive. By keeping the estate open and prosecuting derivative standing, Ironwood preserves the ability to pursue the Recovery Actions in this Court and to use the investigative and discovery tools the Bankruptcy Code provides, including examinations under Rule 2004, to trace and recover the dissipated Bitcoin at the center of this case. A purchaser that simply took the claims and closed would enjoy none of that. It would be forced to commence litigation on day one against defendants it has had no ability to identify, and without the benefit of the Bankruptcy Code's discovery and tracing tools — a path far more likely to fail. The structure Ironwood designed exists to avoid precisely that outcome.

22.     This structure is not a defect to be "conformed" away; it is the feature that makes Ironwood's Bid worth more. Because keeping the estate open and litigating on derivative standing materially increases the probability of recovery, it increases the amount Ironwood is willing to pay

— which is why Ironwood offers both more cash at closing and a waterfall that returns recoveries to creditors. A greater probability of recovery yields a higher bid, and a higher bid yields greater creditor recoveries. The Trustee's demand that any competing bid mirror a structure that forgoes these advantages elevates form over the estate's recovery. Indeed, when Ironwood asked the Trustee whether the Stalking Horse APA would even permit the Stalking Horse Bidder to use this Court to pursue the claims, the Trustee would not say, answering only that "the APA speaks for itself." If the Stalking Horse structure cannot deliver what Ironwood's structure was built to deliver, that is a reason to welcome Ironwood's Bid into the auction — not to exclude it.

23. Courts in this District have approved precisely this kind of arrangement. In *EcoSource, LLC v. Aquino (In re LP&D, Inc.)*, the Chapter 7 trustee authorized a non-trustee party to prosecute the estate's claims on derivative standing, at that party's sole cost, in exchange for a guaranteed and enhanced recovery to the estate. The Bankruptcy Court approved the arrangement under the business judgment standard of Section 363(b), and the United States District Court for the District of Massachusetts affirmed, holding that the trustee acted within his authority and that the arrangement conferred material benefits because it secured the estate a recovery greater than a competing offer while shifting all further litigation cost and risk off the estate. 622 B.R. 473 (D. Mass., 2020). Ironwood's Bid rests on the same mechanism, and it offers this estate more: a larger guaranteed payment at closing and a waterfall that returns recoveries to creditors, all at Ironwood's cost and risk.

24. Further, Ironwood has committed to pay for the very thing the Trustee professes to worry about. Under its Bid, Ironwood — not the estate — bears the cost of keeping the Bankruptcy Case open and reimburses the Trustee for the reasonable, documented out-of-pocket expenses of doing so, and bears the entire burden of prosecuting the Recovery Actions, performing all of the

work itself. The estate is thus left with more value and no burden. In these circumstances, the Trustee's refusal to engage is an unwillingness to undertake the work his fiduciary role requires. The law permits, and the estate's interest favors, precisely the arrangement Ironwood proposes.

## CONCLUSION

25.     Ironwood has invested considerable time and resources in this sale process, submitting a bid that offers the estate materially greater value than the Stalking Horse Bid, and stood ready to compete on the merits. Given the Trustee's complete lack of engagement, however — including his refusal to discuss any term of the Bid, to respond to Ironwood's questions, or to evaluate the greater value the Bid offers the estate — Ironwood does not wish to expend further resources in a process the estate's fiduciary has declined to advance. Accordingly, at this time, Ironwood does not intend to attend the Auction or the Sale Hearing.  Nonetheless, Ironwood remains willing to discuss its offer should the Trustee or any party in interest wish to do so.

## RESERVATION OF RIGHTS

26.     Ironwood files this Response without prejudice to, and expressly reserving, all of its rights and remedies, including with respect to the sale process and the auction, and reserves the right to supplement, amend, or be heard further at the Sale Hearing and any adjournment thereof.

Dated: June 30, 2026           **MCDERMOTT WILL & SCHULTE LLP**
      New York, New York

*/s/ Darren Azman*
Darren Azman (MA BBO# 678530)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5615
E-mail:  dazman@mcdermottlaw.com

*Counsel to Ironwood Recovery Holdings LLC*

9

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 30, 2026, a true and correct copy of the foregoing was served by this court's CM/ECF to all parties that are registered to receive such notice in the above case.

*/s/ Darren Azman*
Darren Azman