**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>JASON M. KAHAN,<br><br>Debtor. | Chapter 7<br><br>Case No. 24-11592 |
| PBTC RECOVERY PARTNERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HUNTER PENN aka ALEX COLVIN, NILS TROSTERUD, SISSEL TROSTERUD, QUANTUM RESOURCE GROUP QRG AS, NORDCAP ADVISORS AS, and JOHN DOES 1-10,<br><br>Defendants. | Adv. Pro. No. ______ |

## COMPLAINT

Plaintiff PBTC Recovery Partners, LLC ("PBTC" or "Plaintiff"), by and through its undersigned counsel, alleges for its complaint and claims for relief against Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS ("Quantum"), NordCap Advisors AS ("NordCap") and John Does 1-10 (collectively, "Defendants") as follows:

## NATURE OF ACTION

1. PBTC brings this adversary proceeding to (i) obtain turnover of and to recover possession and control over the Bitcoin Assets;[1] (ii) recover damages from parties who

[1] The "Bitcoin Assets" are more fully described in paragraph A of Exhibit A to the Bill of Sale attached to the *Appendix in Support of Motion by PBTC Recovery Partners, LLC for Preliminary Injunction and Related Relief* ("Appendix") at Exhibit A. For the avoidance of doubt, the term "Bitcoin Assets" refers to the Bitcoin and related access credentials. The term "Purchased Assets" refers to all assets described in Exhibit A to the Bill of Sale. *See* Appendix, at Ex. A (Bill of Sale).

wrongfully possessed, exercised dominion, and/or control, transferred, sold, or otherwise benefited from the Bitcoin Assets; (iii) recover damages for breach of contract and negligence from certain defendants; and (iv) obtain injunctive relief to prevent further transfer, concealment, or dissipation of the Bitcoin Assets.

2. Bitcoin is a digital asset recorded on a decentralized blockchain. The ability to transfer Bitcoin ordinarily requires access to private keys, seed phrases, wallet files, or other necessary credentials. A person with such access can rapidly transfer or liquidate the Bitcoin.

3. Prior to commencing his chapter 7 case, Jason M. Kahan ("Kahan" or the "Debtor") owned approximately 1,800 Bitcoin, together with the associated wallets, wallet addresses, and related access credentials, including private keys. Kahan claims that he lost access to the Bitcoin Assets before initiating his chapter 7 bankruptcy case. Upon commencement of the chapter 7 case, Kahan's rights in the approximately 1,800 Bitcoin and other Bitcoin Assets became property of the bankruptcy estate. Through a sale supervised by the United States Bankruptcy Court for the District of Massachusetts (the "Court"), PBTC acquired Kahan's and the estate's rights in the Bitcoin Assets, as well as the rights to pursue any and all claims to recover the Bitcoin Assets.

4. Upon information and belief, each of the Defendants has possessed, controlled, or had access to the Bitcoin Assets or related credentials, has acted in concert with persons who have such possession, control, or access, and/or has the ability to interfere with PBTC's access to and/or recovery of the Bitcoin Assets and related credentials. On July 31, 2026, undersigned counsel for PBTC caused demand letters to be sent to Hunter Penn, Nils Trosterud, Quantum and NordCap by email and overnight mail, requesting that they each turn over any Bitcoin Assets in their possession, custody and/or control. To date, none of them has complied or responded. This

continued withholding of the Bitcoin Assets and related credentials creates an immediate risk of further transfers, concealment or dissipation, and threatens PBTC with irreparable harm.

**THE PARTIES**

5. PBTC is a Delaware limited liability company with its principal place of business located at 800 Miramonte Drive, Suite 380, Santa Barbara, CA 93109.

6. Hunter Penn is an individual with a last known address at the Bel Air Inn located at 387 Riverdale St, West Springfield, MA 01089.

7. Nils Trosterud is an individual with a primary residence located at Gabels Gate 41, 0301, Oslo, Norway.

8. Sissel Trosterud is an individual with a primary residence located at Gabels Gate 41, 0301, Oslo, Norway.

9. Quantum is a Norwegian private limited liability company with its principal place of business located at Martin Linges vei 25, 1364 Fornebu, Norway.

10. NordCap is a Norwegian private limited liability company with its principal place of business located at Hegdehaugsveien 31, 0352 Oslo, Norway.

11. John Does 1–10 are individuals, entities, or other persons whose identities are presently unknown and who, on information and belief: (A) possess, control, accessed, transferred, or assisted in transferring the Bitcoin Assets or proceeds thereof; (B) interfered with PBTC's access to the Bitcoin Assets; and/or (C) are in a position to assist those with such access and thus are properly enjoined. PBTC will amend this Complaint to identify the Doe defendants when their identities are discovered.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (E), and (O) and Rule 201 of the Local Rules of the United States District Court for the District of Massachusetts.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1409 because this adversary proceeding arises in, arises under, or is related to the Debtor's bankruptcy case pending in this district.

14. This Court has personal jurisdiction over each of the Defendants by virtue of, among other things, the fact that they each directly or indirectly engaged with the Debtor and/or made representations to the bankruptcy estate regarding the Bitcoin Assets.

15. Pursuant to the *Order (i) Authorizing and Approving the Sale of Certain of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (ii) Granting Related Relief* [Docket No. 343] (the "Sale Order"),[2] this Court retained "jurisdiction over any action, suit or proceeding brought by the Buyer to compel turnover of the Purchased Assets, including but not limited to any action under 11 U.S.C. § 542, any other provision of Chapter 5 of the Bankruptcy Code or applicable law." Appendix, Ex. B ¶ LL (Sale Order); *see id.* ¶¶ RR, 22(d).

16. Plaintiff consents to the entry of a Final Order and/or Final Judgment by the Court.

17. This adversary proceeding is initiated under Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[2] A copy of the Sale Order is attached to the Appendix at Exhibit B.

# FACTUAL BACKGROUND

## A. The Debtor's Bankruptcy Filing

18. On August 7, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtor's chapter 7 case is currently administered under Case No. 24-11592 (the "Chapter 7 Case"). On August 27, 2024, Donald Lassman (the "Bankruptcy Trustee") was appointed as the Chapter 7 Trustee in the Chapter 7 Case [Docket No. 25].

19. In his schedules filed with the Court [Docket No. 36] ("Schedule A/B"), the Debtor listed Bitcoin worth approximately $110,400,000.00 as of the Petition Date (the "Estate Bitcoin"). The Estate Bitcoin is comprised of approximately 1,800 Bitcoin, held in certain wallets and addresses as more particularly described in Exhibit A to the Bill of Sale. As of the Petition Date, the Estate Bitcoin constituted property of the Debtor and/or the Debtor's estate. *See Debtor's Motion For Declaratory Determination Regarding The Ownership Of The Debtor's Bitcoin* [Docket No. 208], at 2; *id.*, Ex. E.

## B. The Debtor's Pre-Bankruptcy Acquisition and Loss of Access to the Bitcoin Assets

20. Kahan testified that in or around 2013, he purchased approximately 2,000 Bitcoin.[3] At the time, Kahan claimed that his Bitcoin was held through cryptocurrency custodians or exchanges.[4] Kahan claims to have lost his password(s)/seed phrase(s) to access his account(s), and that the account(s) "kind of [got] out of sight of the mind" while he was building a rapidly growing company.[5]

---

[3] *See* Appendix, Ex. C, at 30:9-10 (Tr. Oct. 8, 2024 Section 341 Meeting).

[4] *See id.* at 30:13-16.

[5] *See id.* at 31:17–32:12, 33:22–34:3.

### *i.* *The Debtor Hires Hunter Penn*

21. Kahan testified that in early 2021 or 2022, he was a victim of identity theft, and that in an effort to secure his identity, he hired Penn, whom he was introduced to as "Alex Colvin,"[6] as a cybersecurity consultant. Kahan claimed that during the course of this relationship, Penn located cryptocurrency wallet files associated with the Bitcoin Assets on Kahan's Google Drive. *See* Appendix, Ex. C, at 36:2-16, 40:2-15, 41:9–42:4 (Tr. Oct. 8, 2024 Section 341 Meeting).

22. Kahan testified that in approximately July or August 2022, Penn told Kahan that he had moved the Bitcoin into a cold wallet, specifically a paper wallet or similar cold-storage arrangement. Kahan also testified that Penn told him that he should move the Bitcoin to another wallet or a cryptocurrency exchange account, but that Kahan did not do so because he did not understand Penn's instructions and was unable to complete the process. Kahan also claimed that he did not understand at that time that the Bitcoin had increased in value and was worth tens of millions of dollars. *See* Appendix, Ex. C, at 43:24–46:10 (Tr. Oct. 8, 2024 Section 341 Meeting).

23. Kahan claims that around this time in 2022 Penn grew frustrated with Kahan, and that Penn told Kahan that if he did not move the Bitcoin as instructed, Penn would take a portion of the Bitcoin as a consulting fee. Kahan claims that Penn then unilaterally declared that he was entitled to approximately 654 Bitcoin as a self-assessed fee, and that Penn subsequently (and without Kahan's authorization or approval) misappropriated approximately 654 Bitcoin. *See* Appendix, Ex. C, at 45:10–47:12 (Tr. Oct. 8, 2024 Section 341 Meeting).

---

[6] Penn used multiple names and payment identities. In addition to the name Alex Colvin, which Penn used to communicate with Kahan, Penn also used accounts under the names Samantha Gravel and Christopher Short to receive payments. *See* Appendix, Ex. D, at 19:20–20:8 (Tr. Dec. 27, 2024 Section 341 Meeting).

24. Kahan testified that Penn later provided him with what he described as a key or other purported access credential for the approximately 1,200 Bitcoin that remained, but that the key/access credential was ineffective. Kahan claimed that Penn had encrypted the key/access credential in a way that prevented Kahan (or anyone other than Penn) from actually accessing or moving the remaining approximately 1,200 Bitcoin. *See* Appendix, Ex. C, at 47:20–48:7 (Tr. Oct. 8, 2024 Section 341 Meeting).

25. Kahan claimed that Penn then began demanding money from Kahan in exchange for continued assistance, movement of the Bitcoin, or production of the necessary access credentials. Kahan testified that Penn at first characterized these demands as purported consulting fees, but that over time Penn simply began requesting additional money without tying those requests to any purported consulting work. *See* Appendix, Ex. C, at 48:7-24, 50:3-15 (Tr. Oct. 8, 2024 Section 341 Meeting). Kahan testified that he paid Penn substantial sums over time, and that although the payments were often in relatively small increments, the aggregate amount exceeded $1 million and may have exceeded $1.5 million.[7] Kahan claimed that he borrowed money and involved friends or colleagues in an effort to satisfy Penn's demands, because Penn had repeatedly represented to Kahan that release or movement of the Bitcoin was imminent. *See* Appendix, Ex. C, at 49:8–50:24 (Tr. Oct. 8, 2024 Section 341 Meeting).

26. According to Kahan, Penn eventually claimed that he had lost the ability to access the remaining approximately 1,200 Bitcoin, and that he was working to recover access through various means. Penn continued to request money from Kahan to facilitate these efforts, and Penn and Kahan regularly discussed Penn's supposed progress. Kahan testified that Penn

---

[7] Payments to Penn or persons associated with Penn were made through various channels, including Cash App, Venmo, PayPal, and at times cryptocurrency purchased through mechanisms such as CoinStar, MoonPay, Exodus, or other crypto-purchase services. *See* Appendix, Ex. D, at 22:6-18, 32:6–34:2 (Tr. Dec. 27, 2024 Section 341 Meeting).

continued to communicate with Kahan daily or near-daily through and including his Chapter 7 Case regarding the Bitcoin and for payment. *See* Appendix, Ex. C, at 43:3-4, 47:15–50:7 (Tr. Oct. 8, 2024 Section 341 Meeting).

27. Kahan claimed that beginning in mid-2023, Kahan began working with a series of investigators and consultants in an effort to identify and locate Penn, whom Kahan knew as "Alex Colvin," and to recover the misappropriated Bitcoin. *See* Appendix, Ex. C, at 39:12–40:5, 55:16–57:13 (Tr. Oct. 8, 2024 Section 341 Meeting); Appendix, Ex. D, at 16:21–18:21 (Tr. Dec. 27, 2024 Section 341 Meeting).[8]

28. As of August 2022, Kahan's Bitcoin was present in a single wallet with an address ending in -c7kc. On or around September 7, 2022 approximately 629 BTC were moved to an address ending in -v30x.

29. In late October 2023, the approximately 1,800 Bitcoin was moved to four addresses: (i) 1,000 Bitcoin was transferred to an address ending in -l0hz; (ii) approximately 610 Bitcoin was transferred to the address ending in -st7y; (iii) 100 Bitcoin was transferred to the address ending in -qssr; and (iv) 100 Bitcoin was transferred to the address ending in -gx4x.

30. In May 2024, after identifying Colvin as Hunter Penn and determining his location, the investigators working with Kahan visited Penn's residence on multiple occasions. During an initial visit, Penn was reportedly apologetic, confirmed that the Bitcoin belonged to Kahan, claimed that a person named "Alex Colvin" had control of the Bitcoin, and offered to help to cause the Bitcoin to be transferred to Kahan. During a second visit, however, after

[8] Kahan also worked with attorney Ken Cuccinelli in connection with recovery efforts and proof of custodial ownership. Kahan testified that he had provided Cuccinelli with ownership materials, that communications were made with Coinbase concerning accounts opened in Kahan's name, and that they were "in the middle of dealing with Binance and Coinbase." *See* Appendix, Ex. C, at 52:6–53:3 (Tr. Oct. 8, 2024 Section 341 Meeting); Appendix, Ex. D, at 35:23–36:16 (Tr. Dec. 27, 2024 Section 341 Meeting).

apparently realizing that the investigators had limited authority to compel him, Penn changed course, appeared visibly agitated and evasive, and refused to discuss the matter further. *See* Appendix, Ex. C, at 55:16–57:1 (Tr. Oct. 8, 2024 Section 341 Meeting); Appendix, Ex. D, at 6:6-15 (Tr. Dec. 27, 2024 Section 341 Meeting).

31. Kahan testified that he continued to make payments to Penn or Penn-associated accounts throughout this period, and that investigators had advised him to maintain "business as usual" with Penn to avoid raising Penn's suspicions. *See* Appendix, Ex. D, at 17:2–18:6 (Tr. Dec. 27, 2024 Section 341 Meeting).

32. On or about June 26, 2024, the 610 Bitcoin was further transferred to three additional addresses, including 606 Bitcoin, which was sent to an address ending in -rxkm. Kahan claims Penn was responsible for this transfer. *See* Appendix, Ex. C, at 50:16-24 (Tr. Oct. 8, 2024 Section 341 Meeting).

33. Kahan testified that after he filed for bankruptcy in August 2024, he informed Penn that he was in bankruptcy and that the Bitcoin was being discussed with the bankruptcy trustee and counsel. *See* Appendix, Ex. C, at 50:3-7, 54:7-15 (Tr. Oct. 8, 2024 Section 341 Meeting).

34. In September 2024, Kahan filed his Schedules and Statement of Financial Affairs, and identified Penn as a "Custodian of the Debtor's bitcoin." [Docket No. 36], Schedule A/B at 3.

35. On November 25, 2024, the Bankruptcy Trustee sent Penn a Demand for Turnover of Property of the Bankruptcy Estate and directed Penn to "immediately turn over . . . all Bitcoin (including keys and/or passwords and usernames) that you are holding or are

otherwise controlling now or at any time in the future." The Bankruptcy Trustee set a compliance deadline of December 6, 2024. Penn did not comply.

36. On December 9, 2024, the Court granted the Bankruptcy Trustee's application to employ Kenneth T. Cuccinelli, II ("Special Counsel") as special counsel to the Bankruptcy Trustee.[9] On December 30, 2024 and January 8, 2025, Penn (using an email address associated with the name "Alex Colvin") corresponded with Special Counsel to the Bankruptcy Trustee. In those emails, Penn (i) identified three specific Bitcoin wallets that Penn claimed belonged to Kahan, containing 1,000 Bitcoin, 100 Bitcoin, and 100 Bitcoin, respectively; (ii) stated that "certain exploits were utilized to facilitate movement without requiring the private key" and that "those exploits have since been patched"; and (iii) characterized certain movements of the Bitcoin as "an unforeseen consequence of attempting to retrieve the key" rather than as an intentional taking.

37. On January 23, 2025, the Bankruptcy Trustee filed a *Motion to Conduct Rule 2004 Examination of Hunter Penn* [Docket No. 121]. The Court granted the motion on February 26, 2025 [Docket No. 145], and the Bankruptcy Trustee served the Rule 2004 subpoena on Penn. Penn thereafter filed two pro se motions to quash and objections to the subpoena [Docket No. 150 (Mar. 13, 2025); Docket No. 184 (May 28, 2025)], asserting, among other things, that his engagement with Kahan "was strictly limited to that of a tech consultant" and that he was unable to produce materials in response to the discovery requests because, since 2016, Penn purportedly had followed a "strict data management policy" involving routine deletion of data. Penn

9 *See Application of Chapter 7 Trustee to Employ Kenneth T. Cuccinelli, II as Special Counsel* [Docket No. 61]; *Supplement by Chapter 7 Trustee Regarding Employment of Kenneth T. Cuccinelli, II as Special Counsel* [Docket No. 96]; *Order* [Docket No. 104].

represented that the information sought by the subpoena "was routinely and irretrievably deleted in November of last year [i.e., 2024]."

38. On July 11, 2025, the Bankruptcy Trustee filed a *Motion to Compel Penn's Attendance at Rule 2004 Examination and Production of Documents* [Docket No. 187].

39. On October 2, 2025, Penn appeared for the Rule 2004 examination. Penn was examined by Special Counsel to the Bankruptcy Trustee. During that examination, Penn, among other things, (i) confirmed that Kahan was, in fact, the owner of the approximately 1,800 Bitcoin that were then property of the estate, and (ii) acknowledged that he had demanded payment from Kahan in exchange for moving the Bitcoin and releasing the wallet keys. Penn then abruptly walked out of the deposition before it was completed.

***ii. The Debtor Engages NordCap and Others to Recover His Bitcoin***

40. During the course of his lengthy dealings with Penn regarding the Bitcoin, Kahan had also engaged others in a parallel effort to recover the Bitcoin.

41. In July 2024, Kahan testified that he was introduced by his acquaintance Chris Green[10] to Nils Trosterud, who was a former colleague of Green and who claimed to be the Chief Executive Officer and Chairman of NordCap, a Norwegian entity. Kahan claimed that NordCap and its subcontractor Quantum (also a Norwegian entity) were presented to Kahan as Bitcoin recovery contractors of last resort.

42. On November 25, 2024, the Bankruptcy Trustee, on the same day he sent a turnover demand to Penn, sent a written turnover demand to Green, similarly demanding the

[10] Upon information and belief, Mr. Green died on January 31, 2026; however, no death certificate has been reviewed.

immediate turnover of Bitcoin, private keys, and/or other access credentials by December 6, 2024. Like Penn, Green did not comply.

43. On or about December 6, 2024, NordCap and Quantum purportedly entered into a Software Recovery Agreement (the "SRA") to recover a portion of Kahan's Bitcoin—specifically, approximately 1,000 Bitcoin held in a wallet ending in -l0hz. Nils Trosterud signed the SRA on behalf of NordCap. In the SRA, Quantum represented in writing that it had "identified a private key associated with the wallet" ending in -l0hz. In particular, the SRA stated that "the Software Company [*i.e.*, Quantum] sent a small Bitcoin transaction of 0.0000033 to the wallet containing the 1,000+ Bitcoin," that "[t]he Third Party seeing the transaction accessed the 1,000+ wallet," and that the private key for this wallet was recorded and "matched the private key for the 1,000+ Bitcoin wallet recorded previously" by Quantum. Blockchain data indicates 0.0000033 Bitcoin were transferred to the wallet in or around January 2025. The SRA also provided that Quantum would access the wallet ending in -l0hz on December 16, 2024, take a 10% fee equal to approximately 100 Bitcoin, and remit the 900 Bitcoin to a NordCap-designated wallet. The blockchain records do not show any fee was paid to Quantum.

44. On December 11, 2024, Nils Trosterud emailed an intermediary that had been engaged by Kahan in support of his recovery efforts, claiming that NordCap and Quantum had recovered the private keys for the wallets containing the approximately 1,810 Estate Bitcoin and that NordCap and Quantum would be moving the Bitcoin to "wallets controlled by us."[11] In relevant part, Nils Trosterud stated:

---

[11] *See* Appendix, Ex. F (Nils Dec. 2024 Emails); Appendix, Ex. D, at 13:14-17 (Tr. Dec. 27, 2024 Section 341 Meeting).

> We have the private key to the wallet containing 1000.00131470 BTC, as well as the same private key that we discovered when the 3rd Party accessed the same wallet to investigate the 0.0000033 BTC we sent as an unconfirmed test transaction to the wallet.
>
> At the same time, we will go for the 610 BTC wallet.
>
> The then 1810 BTC were located in 4 wallets, containing 1.000, 100, 100 and 610 BTC respectively. On June 26, 2024, the 610 BTC wallet was emptied except for 0.0001 BTC that still remain. The 610 BTC were transferred to 3 new wallets, containing 1, 3 and 606 BTC respectively. This means the 1.810 BTC are now located in 7 wallets.
>
> We will move the 1000.00131470 BTC and the 606 BTC to two new wallets, controlled by us.

45. Around this time, Green texted Kahan that Nils Trosterud had "accessed the 1,000+ wallet twice. Each time, they picked up the same private key," which Green claimed "solves everything." Green also claimed that Nils Trosterud had also obtained the private keys to the 606 Bitcoin wallet, stating that "Nils is controlling the two private keys."[12]

46. On or around January 27, 2025, Kahan began receiving phone calls, text messages, and emails from NordCap demanding additional funds prior to NordCap turning over any of the Bitcoin.

47. Notwithstanding NordCap's coercive conduct, and recognizing that NordCap continued to represent that it and Quantum had identified working private keys to the 1,000 Bitcoin and 606 Bitcoin wallets, Kahan and the Special Counsel to the Bankruptcy Trustee elected to structure a written recovery agreement designed to (i) convert NordCap's continuing demands into a Court-supervised recovery pathway, (ii) require NordCap to deliver recovered Bitcoin, private keys, or access credentials directly to the Bankruptcy Trustee rather than to

---

[12] *See* Appendix, Ex. G (Green-Kahan Dec. 2024 Messages).

Kahan, and (iii) impose a short deadline and 'time of the essence' language to force performance.

48. In or around February 2025, Kahan and NordCap traded drafts of and purported to enter into one or more versions of a Contingent Services Agreement (the "CSA"),[13] which was subsequently revised. The CSA generally provided that NordCap "has or has [sic] access to the technical expertise needed to recover the Bitcoin from the Bitcoin wallets," and would deliver certain portions of Kahan's Bitcoin to the Bankruptcy Trustee. The terms of this potential agreement varied between the different versions of the CSA, but the version dated February 3, 2025, provided that NordCap would first transfer up to $5,000,000 in recovered Bitcoin to the Bankruptcy Trustee before executing further transfers, that NordCap would then take a 20% fee "of all Bitcoin contained in the Bitcoin wallets" after that initial transfer, and that any residual after those distributions would belong to Kahan. The CSA also provided that NordCap would complete these transfers within a matter of days. NordCap did not meet the deadline.

49. On or about February 7, 2025, Kahan and NordCap purported to execute an Addendum to the CSA, signed by Nils Trosterud on behalf of NordCap, extending NordCap's performance deadline to 12:00 p.m. Eastern Time on February 10, 2025, with "time continuing to be of the essence."[14] NordCap did not meet the extended February 10, 2025 deadline.

50. On or about February 11, 2025, Kahan and NordCap purported to execute another Addendum to the CSA, again signed by Nils Trosterud on behalf of NordCap, extending NordCap's performance deadline to 11:59 p.m. Eastern Time on February 14, 2025, with "time

---

[13] *See* Appendix, Ex. H (Contingent Services Agreement).

[14] *See* Appendix, Ex. I (First Addendum to Contingent Services Agreement).

continuing to be of the essence."[15] NordCap did not meet the extended February 14, 2025 deadline.

51. On February 27, 2025, Special Counsel to the Bankruptcy Trustee sent additional written demand letters to Nils Trosterud in his personal capacity and to NordCap, again demanding turnover of all Bitcoin, private keys, passwords, wallet files, and related access credentials belonging to Kahan or the bankruptcy estate.[16] No Bitcoin, private keys, or other access credentials were turned over in response to those demand letters.

52. On December 4, 2025, approximately 1,095 of the Bitcoin was moved through a coordinated series of transactions into three newly-funded Bitcoin wallets.

## C. <u>Bankruptcy Court Sale of Bitcoin Assets to PBTC</u>

### *i. The Bankruptcy Trustee Determines that the Bitcoin Assets Should Be Sold*

53. In early January 2026, after undertaking recovery efforts for approximately fifteen months without recovering the Bitcoin, private keys, or other access credentials, the Bankruptcy Trustee initiated a process to sell the estate's rights in Kahan's Bitcoin and related recovery claims.

54. On January 30, 2026, the Bankruptcy Trustee received several offers from prospective purchasers. Approximately 12 hours after the bid deadline passed, approximately 500 Bitcoin was transferred from the address ending in -l0hz, and sent to a newly created recipient address, ending in -p0ug. Kahan notified the Bankruptcy Trustee of this unauthorized transfer on February 4, 2026, and alleged that Penn, Green (who had passed away on January 31,

---

15 *See* Appendix, Ex. J (Second Addendum to Contingent Services Agreement).

16 *See* Appendix, Ex. K (Trustee's Turnover Demand to Nils); Appendix, Ex. L (Trustee's Turnover Demand to NordCap).

2026), and NordCap potentially had some involvement in the transfer, given that they had been solicited as bidders during the auction.

55. On March 22, 2026, two outflows totaling 497 Bitcoin occurred from the address ending in -p0ug, 4.01 Bitcoin of which was sent to the address ending in -5pw5, and 492.89 Bitcoin of which was sent to the address ending in -eqt6.

56. On May 6, 2026, the Bankruptcy Trustee entered into an Asset Purchase Agreement (the "APA") with Pioneer Funding Group, LLC ("Pioneer") to sell the estate's rights in the Estate Bitcoin and related claims, subject to higher and better offers.

57. On May 8, 2026, the Bankruptcy Trustee filed a Motion for Sale of Property Free and Clear of Liens Under Section 363(f) [Docket No. 260] (the "Sale Motion"), seeking, among other things, to approve sale procedures, the APA, and authorize the sale of the described assets free and clear of liens, claims, encumbrances and other interests.

58. On June 2, 2026, approximately 494 Bitcoin was moved from the address ending in -ej6c, with 5 Bitcoin being sent to an address ending in -2lz5, and 489.21 Bitcoin sent to an address ending in -ha7z.

59. On June 26, 2026, Pioneer assigned its rights under the APA to PBTC [Docket No. 284].

60. Also on June 26, 2026, competing bids for the Estate Bitcoin and related claims were submitted, including by Samara CR Holdings, LLC ("Samara"), a limited liability company formed and managed by Kahan [Docket No. 290]. Samara submitted an initial bid of $415,500. That same day, Kahan objected to the Sale Motion and asserted, among other things, that approximately 185 Bitcoin had been transferred to Binance on December 4, 2025 and might be frozen and recovered [Docket No. 291].

61. In connection with the sale process, the Court also found that, although Kahan had no authority to act on behalf of the estate with respect to the Bitcoin, he had continued to do so, and had remained in constant contact with Penn. The Court found that Kahan's conduct created a risk of further interference with the Bitcoin and could make the assets more difficult to locate.

62. On July 17, 2026, the Court found PBTC to be the successful bidder [Docket No. 343].

***ii. The Court Enters the Sale Order***

63. The Court found that the Sale Notice was "provided to all parties who the Bankruptcy Trustee believes may be in possession or control of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, NordCap Advisors [AS] and the Debtor." Sale Order, ¶ V.

64. The Sale Order made the following findings and rulings with respect to PBTC's turnover rights:

i. "The Trustee acknowledges that some of the Purchased Assets are currently being improperly withheld by third parties. To the greatest extent permitted by law, the Buyer may initiate the Recovery Actions, including claims, causes of action, contested matters, adversary proceedings or other litigation in connection with recovery and access to the Purchased Assets. To the greatest extent permitted by law, the Buyer shall have the sole right to pursue and prosecute all Recovery Actions, at its own cost, and on its own behalf and as successor-in-interest to the Debtor's estate and the Debtor. Any and all proceeds and recoveries from any Recovery Actions shall be the sole property of the Buyer. The Trustee, the Debtor, the Debtor's estate and its creditors shall have no interest or claim to any proceeds and recoveries from the Recovery Actions." *Id.* ¶ KK;

ii. "Section 542(a) provides that 'an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.'

11 U.S.C. § 542(a). The Purchased Assets are not of inconsequential value or benefit to the estate. To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS and NordCap Advisors [AS], such third parties shall immediately deliver possession, control, and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law. To the extent permitted under applicable law, this Court shall retain jurisdiction over any action, suit or proceeding brought by the Buyer to compel turnover of the Purchased Assets, including but not limited to any action under 11 U.S.C. § 542, any other provision of Chapter 5 of the Bankruptcy Code or applicable law." *Id.* ¶ LL;

iii. "To the greatest extent permitted by law, the Buyer may initiate Recovery Actions to recover and gain access to the Purchased Assets. The Buyer has the sole right to pursue and prosecute all Recovery Actions, at its own cost, and on its own behalf and as successor-in-interest to the Debtor's estate and the Debtor. Any and all proceeds and recoveries from the Recovery Actions shall be the sole property of the Buyer. The Trustee, the Debtor, the Debtor's estate and its creditors shall have no interest or claim to any proceeds and recoveries from the Recovery Actions." *Id.* ¶ 14;

iv. "The Purchased Assets are not of inconsequential value or benefit to the estate. To the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, and NordCap Advisors [AS], such third parties shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law." *Id.* ¶ 15.

65. The Sale Order also provided that the Court retained jurisdiction to determine and adjudicate such turnover actions by PBTC. *See id.* ¶¶ RR, 22.

66. On July 29, 2026, 10 Bitcoin, valued at approximately $650,000 at the time of transfer, was moved out of the address ending in -yrlk to an anonymous non-exchange wallet.

67. On July 31, 2026, PBTC, through its counsel, sent the letters collectively attached as Exhibit Q to the Appendix (the "<u>Turnover Demands</u>") to Penn, Nils Trosterud, Quantum and NordCap by email and overnight mail. The Turnover Demands requested that Penn, Nils Trosterud, Quantum and NordCap each turn over any Bitcoin Assets in their possession, custody

and/or control. As of the date hereof, PBTC has not received any response from Penn, Nils Trosterud, Quantum or NordCap.

**COUNT I**
**(Enforcement of the Sale Order)**

68. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

69. Paragraph 15 of the Sale Order provides that "[t]o the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, and NordCap Advisors [AS], such third parties shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law."

70. Pursuant to the Bill of Sale, PBTC acquired "All of the Seller's, the Estate's and the Debtor's legal and equitable rights, interests, title, and standing to pursue any and all claims, suits, and causes of action, including but not limited to all causes of action arising under Chapter 5 of the Bankruptcy Code including under 11 U.S.C. §§ 542 and 548, relating to recovering the Bitcoin Wallets and the Estate Bitcoin and access thereto from any party, including, but not limited to Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, NordCap Advisors [AS] and any other third party who may have access and/or control over the Bitcoin Wallets and Estate Bitcoin." *See* Bill of Sale, at Ex. A, ¶ C.

71. The Bitcoin Assets were property of the Debtor's estate and were property that the Bankruptcy Trustee was authorized to sell under section 363 of the Bankruptcy Code.

72. The Bitcoin Assets are not of inconsequential value or benefit.

73. On information and belief, one or more of the Defendants has possession, custody, control, access, or the ability to interfere with PBTC's access to the Bitcoin Assets, including the private keys, seed phrases, wallet files, access credentials, and/or proceeds thereof.

74. PBTC has demanded return of the Bitcoin Assets, but Defendants have failed to respond to PBTC's demands.

75. PBTC is entitled to an order of this Court enforcing the terms of the Sale Order and requiring Defendants and any third parties to deliver to PBTC possession, control and access to the Bitcoin Assets, provide all access credentials necessary to control them, account for all transfers or proceeds, and cease interfering with PBTC's possession, custody, control, and access.

**COUNT II**
**(Turnover Pursuant to Bankruptcy Code Section 542(a) Against All Defendants)**

76. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

77. Paragraph 15 of the Sale Order provides that "[t]o the extent any third party is in possession, control or in any way interfering with the Buyer's access to any of the Purchased Assets, including Mr. Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, and NordCap Advisors [AS], such third parties shall immediately deliver possession, control and access to the Purchased Assets (and any proceeds thereof) to the Buyer to the greatest extent permitted by law."

78. Pursuant to the Bill of Sale, PBTC acquired "All of the Seller's, the Estate's and the Debtor's legal and equitable rights, interests, title, and standing to pursue any and all claims, suits, and causes of action, including but not limited to all causes of action arising under Chapter 5 of the Bankruptcy Code including under 11 U.S.C. §§ 542 and 548, relating to recovering the

Bitcoin Wallets and the Estate Bitcoin and access thereto from any party, including, but not limited to Hunter Penn, Nils Trosterud, Sissel Trosterud, Quantum Resource Group QRG AS, NordCap Advisors [AS] and any other third party who may have access and/or control over the Bitcoin Wallets and Estate Bitcoin." *See* Bill of Sale, at Ex. A, ¶ C.

79. The Bitcoin Assets were property of the Debtor's estate and were property that the Bankruptcy Trustee was authorized to sell under section 363 of the Bankruptcy Code.

80. The Bitcoin Assets are not of inconsequential value or benefit.

81. On information and belief, one or more of the Defendants has possession, custody, control, access, or the ability to interfere with PBTC's access to the Bitcoin Assets, including the private keys, seed phrases, wallet files, access credentials, and/or proceeds thereof.

82. PBTC has demanded return of the Bitcoin Assets, but Defendants have failed to respond to PBTC's demands.

83. PBTC is entitled to judgment requiring Defendants to turn over the Bitcoin Assets, provide all access credentials necessary to control them, account for all transfers or proceeds, and cease interfering with PBTC's possession, custody, control, and access.

**COUNT III**
**(Replevin)**

84. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

85. The Bitcoin Assets constitute specific, identifiable personal property capable of possession, custody, control, transfer, and return, including through control of the associated wallets, private keys, seed phrases, accounts, or other means of access.

86. The Bitcoin Assets have a value exceeding $20 as of the date of this Complaint.

87. The Bitcoin Assets were unlawfully taken by one or more of the Defendants. Upon information and belief, one or more Defendants have possession, custody, or control of some or all of the Bitcoin Assets, including through possession or control of wallets, private keys, seed phrases, accounts, or other access credentials necessary to transfer or return the Bitcoin Assets. The identity of each Defendant exercising such possession, custody, or control is presently within Defendants' knowledge.

88. Pursuant to the Bill of Sale and Sale Order, PBTC is the owner of the Bitcoin Assets and has the right to immediate, exclusive and unqualified possession of the Bitcoin Assets.

89. PBTC is currently deprived of possession of the Bitcoin Assets by the Defendants.

90. PBTC has demanded return of the Bitcoin Assets, but Defendants have failed to respond to PBTC's demands.

91. Plaintiff is therefore entitled to an order directing any Defendant in possession, custody, or control of the Bitcoin Assets to immediately surrender and deliver the Bitcoin Assets to PBTC, or, if delivery cannot be had, to a judgment in the amount of the value of the Bitcoin Assets, together with interest, costs, and such other and further relief as the Court deems just and proper.

**COUNT IV**
**(Conversion)**

92. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

93. Upon closing of the sale approved by the Sale Order, PBTC acquired exclusive ownership and possessory rights in the Bitcoin Assets.

94. Subsequent to the closing of the Sale, one or more Defendants intentionally and wrongfully exercised dominion and control over the Bitcoin Assets by withholding, transferring, concealing, using, or interfering with PBTC's access to the Bitcoin Assets and the credentials necessary to control them. Upon information and belief, one or more Defendants exercised, and continue to exercise, possession, custody, or control over some or all of the Bitcoin Assets or the credentials necessary to access, control, or transfer them. The precise allocation of such possession, custody, or control is presently within Defendants' knowledge.

95. PBTC had ownership and possessory rights in the Bitcoin Assets at the time of Defendants' wrongful conduct.

96. PBTC has demanded and Defendants have refused to provide immediate possession, custody, control, and access to the Bitcoin Assets.

97. PBTC has been damaged by Defendants' wrongful dominion and control of the Bitcoin Assets.

98. As a direct and proximate result of Defendants' conversion, PBTC is entitled to recover all damages caused thereby, including, without limitation, the return of the Bitcoin Assets or, in the alternative, the full value of the Bitcoin Assets wrongfully withheld, transferred, concealed, used, or otherwise converted by Defendants, together with any appreciation, proceeds, profits, or other benefits derived from the Bitcoin Assets, pre- and post-judgment interest, costs, and such other and further relief as the Court deems just and proper.

**COUNT V**
**(Unjust Enrichment)**

99. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

100. One or more of the Defendants obtained and retained a benefit at the expense of Kahan, his bankruptcy estate, and now PBTC by misappropriating, withholding, using, transferring, or interfering with the Bitcoin Assets.

101. The benefits obtained by one or more of the Defendants include, without limitation, possession, custody, control, use, transfer, appreciation in value, proceeds, profits, or other value derived from the Bitcoin Assets.

102. Defendants knew or should have known that they had no lawful right to retain the Bitcoin Assets or any benefit derived from them.

103. It would be inequitable for Defendants to retain the Bitcoin Assets, access credentials, proceeds, or other benefits obtained from or through the Bitcoin Assets.

104. Upon information and belief, the precise Bitcoin Assets, access credentials, proceeds, or other benefits obtained or retained by each Defendant are known to Defendants and not presently known to PBTC without discovery.

105. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff is entitled to restitution, disgorgement, imposition of a constructive trust, turnover of the Bitcoin Assets and any access credentials, proceeds, or traceable assets and proceeds derived therefrom, pre- and post-judgment interest, costs, and such other legal or equitable relief as the Court deems just and proper.

## COUNT VI
## (Constructive Trust Over the Bitcoin Assets)

106. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

107. PBTC holds exclusive ownership, possessory, and equitable rights in the Bitcoin Assets pursuant to the Sale Order and Bill of Sale.

108. One or more of the Defendants acquired, retained, controlled, or benefited from the Bitcoin Assets through misappropriation, conversion, unjust enrichment, fraud, and/or other circumstances making it inequitable for them to retain any legal or beneficial interest in the Bitcoin Assets, access credentials, proceeds, appreciation, profits, or other property derived therefrom.

109. The Bitcoin Assets, any access credentials necessary to control or transfer them, any proceeds, appreciation, profits, or substitute property derived from them, and any property traceable thereto constitute identifiable property over which a constructive trust may be imposed.

110. Legal remedies are inadequate to the extent Defendants retain possession, custody, control, or benefit of the specific Bitcoin Assets, access credentials, proceeds, appreciation, profits, or traceable property derived therefrom.

111. PBTC seeks, as an equitable remedy, the imposition of a constructive trust over the Bitcoin Assets, any access credentials necessary to control or transfer them, any proceeds, appreciation, profits, or substitute property derived therefrom, and any property traceable to the Bitcoin Assets, together with such other and further relief as the Court deems just and proper.

**COUNT VII**
**(Accounting Against All Defendants)**

112. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

113. One or more of the Defendants have possession, custody, control, and/or knowledge of the Bitcoin Assets, the access credentials thereto, and/or proceeds derived therefrom.

114. The relationships among the Defendants, the transfers of Bitcoin Assets, and the disposition of proceeds thereof are complex and not fully known to PBTC.

115. The precise Bitcoin Assets, access credentials, wallets, transfers, transactions, proceeds, appreciation, profits, and other traceable assets received, held, transferred, or disposed of by each Defendant are uniquely within Defendants' knowledge and cannot be determined by PBTC without an accounting.

116. PBTC has no adequate remedy at law because, without an accounting, PBTC cannot determine the location, disposition, proceeds, appreciation, profits, or traceable substitute property derived from the Bitcoin Assets.

117. PBTC is entitled to an accounting from each Defendant of all Bitcoin Assets, access credentials, wallets, transfers, transactions, proceeds, and any other property received, held, transferred, or disposed of by each Defendant relating to the Bitcoin Assets.

**COUNT VIII**
**(Fraud and Fraudulent Misrepresentation Against Penn)**

118. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

119. Penn made numerous false statements of material fact to Kahan, including but not limited to: (a) that Penn would return the Bitcoin Assets upon receiving payment; (b) that Penn was working to generate or recover the access keys necessary to transfer the Bitcoin; (c) that payments to Penn were for legitimate consulting services; (d) that the Bitcoin would be released imminently; and (e) that Penn had lost the keys and was working to recover them.

120. Penn knew these statements were false when made, or made them recklessly without knowledge of their truth or falsity.

121. Penn made these false statements with the intent to induce Kahan to pay money to Penn and to refrain from taking legal action to recover the Bitcoin Assets.

122. Kahan reasonably relied on Penn's false statements and, as a result, paid Penn in excess of $1 million over a period of approximately two years.

123. As a direct and proximate result of Penn's fraud, Kahan and now PBTC have been damaged. PBTC is entitled to recover all damages caused by Penn's fraud, including the value of all payments made to Penn, the value of the Bitcoin Assets wrongfully withheld and the proceeds of any disposition, consequential damages, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT IX**
**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Against Penn)**

124. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

125. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, provides a civil cause of action to any person who suffers damage or loss by reason of a violation of the statute, provided the conduct involves one or more of the factors set forth in 18 U.S.C. § 1030(c)(4)(A)(i).

126. At all relevant times, Kahan owned, used, or controlled computer systems, digital devices, accounts, files, and data, including but not limited to laptop computers, desktop computers, mobile devices, external storage devices, cloud storage accounts, email accounts, password managers, cryptocurrency wallet software, digital wallet files, private keys, seed phrases, recovery credentials, cryptocurrency exchange accounts, and related digital records.

127. Kahan's computer systems, digital devices, accounts, and data were used in or affected interstate or foreign commerce or communication, including because they were connected to and used through the Internet, cloud-based services, email systems, cryptocurrency networks, and other interstate or foreign communications systems. They therefore constituted "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2).

128. Kahan engaged Penn to provide computer consulting and cybersecurity services for the limited purpose of assisting Kahan with identity-theft, malware, and cybersecurity issues.

129. Kahan's authorization to Penn was limited. Kahan authorized Penn to access Kahan's computer systems, digital devices, and files only to the extent reasonably necessary to identify, investigate, and remediate identity-theft, malware, and cybersecurity issues.

130. Kahan did not authorize Penn to access, open, search for, copy, export, photograph, transfer, use, disclose, alter, delete, encrypt, lock, or exercise control over Kahan's cryptocurrency wallet files, private keys, seed phrases, recovery phrases, passwords, password-manager entries, cryptocurrency account credentials, hardware-wallet backups, cloud backups, exchange account credentials, or other access credentials related to Kahan's Bitcoin Assets.

131. Nor did Kahan authorize Penn to use any such files, private keys, seed phrases, recovery phrases, passwords, or credentials to access, transfer, move, encumber, conceal, lock, or otherwise exercise control over the Bitcoin Assets.

132. Notwithstanding these limits, Penn intentionally accessed Kahan's protected computers and digital files without authorization or exceeded his authorized access within the meaning of 18 U.S.C. § 1030(e)(6) by accessing files, accounts, credentials, and information that he was not entitled to access for any purpose under the engagement.

133. Specifically, Penn accessed, copied, obtained, exported, used, or misappropriated cryptocurrency wallet files, private keys, seed phrases, recovery credentials, passwords, and other access credentials related to the Bitcoin Assets. Penn's access to those files, credentials, and information was outside the scope of, and not permitted by, Kahan's limited authorization.

134. Penn thereby intentionally accessed one or more protected computers without authorization or exceeded authorized access and obtained information from those protected computers, in violation of 18 U.S.C. § 1030(a)(2).

135. Penn also knowingly accessed one or more protected computers without authorization or exceeded authorized access with intent to defraud Kahan and/or PBTC.

136. By means of that unauthorized access or access exceeding authorization, Penn obtained information and credentials necessary to access, transfer, move, conceal, lock, or otherwise exercise control over the Bitcoin Assets, including wallet files, private keys, seed phrases, recovery credentials, passwords, and other access credentials.

137. Penn used the information and credentials obtained through his unauthorized access or access exceeding authorization to further his fraudulent scheme and to obtain things of value, including control over and possession of the Bitcoin Assets and payments made to Penn totaling in excess of $1 million.

138. Penn's conduct violated 18 U.S.C. § 1030(a)(4) because Penn knowingly and with intent to defraud accessed protected computers without authorization or exceeded authorized access, furthered the intended fraud by means of that conduct, and obtained things of value.

139. Penn further violated 18 U.S.C. § 1030(a)(5) by knowingly causing the transmission of programs, information, code, commands, credentials, instructions, or other digital communications to protected computers, digital accounts, wallet software, cryptocurrency systems, cloud accounts, or related systems, and, as a result of that conduct, intentionally causing damage without authorization.

140. Penn's transmissions and commands included, upon information and belief, the use or transmission of commands, credentials, wallet instructions, account instructions, password

changes, recovery-setting changes, encryption commands, wallet-transfer commands, remote-access commands, scripts, code, or other digital instructions that impaired Kahan's ability to access, use, control, or recover data, files, credentials, accounts, wallet information, and systems associated with the Bitcoin Assets.

141. As a result of Penn's conduct, the integrity and availability of Kahan's data, files, credentials, wallet information, account information, systems, and/or digital records were impaired, including by encrypting, locking, altering, deleting, transferring, concealing, changing credentials for, changing recovery settings for, or otherwise restricting Kahan's access to information and systems necessary to access or control the Bitcoin Assets.

142. Penn's conduct caused "damage" within the meaning of 18 U.S.C. § 1030(e)(8), including impairment to the integrity or availability of data, programs, systems, and information.

143. Penn's conduct also caused "loss" within the meaning of 18 U.S.C. § 1030(e)(11). Kahan and/or PBTC incurred reasonable costs responding to Penn's unauthorized access, investigating the nature and scope of Penn's conduct, conducting damage assessments, attempting to restore access to affected data, files, accounts, wallets, credentials, and systems, securing remaining digital assets, remediating compromised credentials, and retaining technical, forensic, cybersecurity, and other professionals.

144. Kahan and/or PBTC incurred losses exceeding $5,000 during a one-year period as a result of Penn's CFAA violations, including response costs, forensic-investigation costs, damage-assessment costs, remediation costs, restoration costs, and other costs recoverable under 18 U.S.C. § 1030(e)(11) and § 1030(c)(4)(A)(i)(I).

145. As a direct and proximate result of Penn's violations of the CFAA, Kahan and PBTC suffered damage and loss, including qualifying CFAA losses, the loss or impairment of

access to data, files, credentials, wallet information, systems, and accounts, the loss of the Bitcoin Assets, payments made to Penn, and costs incurred to investigate, respond to, and remediate Penn's misconduct.

146. PBTC holds all claims of Kahan against Penn arising under the CFAA by virtue of acquiring those claims as Purchased Assets under the Sale Order. PBTC therefore stands in Kahan's shoes as a person who suffered damage and loss for purposes of 18 U.S.C. § 1030(g).

147. Pursuant to 18 U.S.C. § 1030(g), PBTC is entitled to maintain a civil action against Penn because Penn's conduct violated the CFAA and caused damage and loss involving at least one of the factors set forth in 18 U.S.C. § 1030(c)(4)(A)(i), including losses exceeding $5,000 during a one-year period.

148. PBTC seeks compensatory damages, injunctive relief, equitable relief, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper, including the value of the Bitcoin Assets, payments made to Penn, qualifying CFAA losses, investigation and remediation costs, and all other damages caused by Penn's CFAA violations.

**COUNT X**
**(Money Had and Received Against Penn)**

149. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

150. Penn received money belonging to Kahan, including payments totaling in excess of $1 million, which Penn obtained through fraud, extortion, and misrepresentation.

151. The payments were made by Kahan, his friends, and his associates through various channels, including Cash App, Venmo, PayPal, and cryptocurrency purchased through CoinStar, MoonPay, Exodus, and other services.

152. Penn received such payments under circumstances that make it inequitable for Penn to retain them. Penn induced the payments through false promises to return the Bitcoin Assets, false representations that he was working to recover access credentials, and threats to permanently withhold or dispose of the Bitcoin Assets.

153. Penn also received the approximately 654 Bitcoin that he removed from Kahan's wallets as an unauthorized "fee." Penn received such Bitcoin under circumstances that make it inequitable for Penn to retain it.

154. In equity and good conscience, Penn should not be permitted to retain the money and Bitcoin he received from or belonging to Kahan.

155. As a direct and proximate result, PBTC is entitled to recover from Penn all money and Bitcoin had and received, including all payments made by Kahan and his associates to Penn, the approximately 654 Bitcoin removed by Penn, and any proceeds, appreciation, or profits derived therefrom, together with pre- and post-judgment interest and such other relief as the Court deems just and proper.

**COUNT XI**
**(Conversion Against Penn)**

156. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

157. Penn improperly converted the 654 Bitcoin he took as a self-assessed fee and is liable to Plaintiff for the value thereof.

**COUNT XII**
**(Breach of Contract Against NordCap and Quantum)**

158. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

159. On or about December 6, 2024, NordCap and Quantum entered into the SRA pursuant to which Quantum represented that it had "identified a private key associated with the wallet" ending in -l0hz containing approximately 1,000 Bitcoin. Under the SRA, Quantum agreed to access the wallet on December 16, 2024, take a 10% fee of approximately 100 Bitcoin, and remit the remaining approximately 900 Bitcoin to a NordCap-designated wallet.

160. In or around February 2025, Kahan and NordCap entered into the CSA in which NordCap represented and warranted that it "has or has access to the technical expertise needed to recover the Bitcoin from the Bitcoin wallets." The CSA obligated NordCap to deliver certain portions of Kahan's Bitcoin to the Bankruptcy Trustee within specified deadlines, with time expressly stated to be "of the essence."

161. NordCap failed to perform under the CSA by the original deadline. On or about February 7, 2025, Kahan and NordCap executed an addendum to the CSA, signed by Nils Trosterud on behalf of NordCap, extending NordCap's performance deadline to 12:00 p.m. Eastern Time on February 10, 2025, with "time continuing to be of the essence." NordCap failed to perform by the extended deadline. On or about February 11, 2025, Kahan and NordCap executed a second addendum to the CSA, again signed by Nils Trosterud on behalf of NordCap, further extending NordCap's performance deadline to 11:59 p.m. Eastern Time on February 14, 2025, with "time continuing to be of the essence." NordCap again failed to perform by the extended deadline.

162. NordCap breached the CSA and the addenda thereto by failing to deliver any Bitcoin, private keys, or access credentials to the Bankruptcy Trustee by any of the agreed deadlines, notwithstanding NordCap's express representations that it had obtained or had access to the private keys necessary to effect such transfer.

163. Quantum breached the SRA by failing to access the wallet ending in -l0hz on December 16, 2024 as agreed, and by failing to remit any Bitcoin to NordCap or to any wallet designated for the benefit of Kahan or his estate, notwithstanding Quantum's express written representation that it had identified and verified the private key necessary to access the wallet.

164. As of the date of this Complaint, NordCap and Quantum have failed to deliver any Bitcoin, private keys, wallet files, seed phrases, or other access credentials to PBTC or its predecessors in interest, despite repeated demands and notwithstanding their express contractual undertakings and representations that they possessed the technical capability and access credentials necessary to do so.

165. As a direct and proximate result of NordCap's and Quantum's breaches of contract, Kahan, his bankruptcy estate, and now PBTC have been damaged. PBTC is entitled to recover all damages caused by such breaches, including the value of the Bitcoin Assets that NordCap and Quantum represented they could recover but failed to deliver, consequential damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT XIII**
**(Preliminary and Permanent Injunction Against All Defendants)**

166. Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

167. Unless and until restrained, enjoined, or compelled by the Court, Defendants will continue to cause significant and irreparable harm to PBTC through their continued unlawful possession, custody, control, use, concealment, transfer, or interference with the Bitcoin Assets and the credentials necessary to control them.

168. The risk that the Bitcoin Assets will be transferred, concealed, dissipated, exchanged, spent, or placed beyond PBTC's reach during the pendency of this action is substantial and imminent. Because cryptocurrency can be transferred rapidly and irreversibly, such harm may occur at any time absent injunctive relief.

169. PBTC is likely to succeed on the merits of its claims because, pursuant to the Sale Order and closing of the Sale, PBTC acquired exclusive ownership and possessory rights in the Bitcoin Assets, and Defendants have wrongfully exercised possession, dominion, custody, control, or interference over the Bitcoin Assets.

170. The harm caused by Defendants' actions is irreparable because cryptocurrency is uniquely susceptible to concealment, irreversible transfer, dissipation, exchange, or movement beyond the reach of PBTC and the Court.

171. PBTC will suffer irreparable harm absent injunctive relief because the Bitcoin Assets can be transferred rapidly, anonymously, and irreversibly. Once transferred, the Bitcoin Assets may be concealed, dissipated, or placed beyond PBTC's reach.

172. The loss of access to and control over PBTC's specific property cannot be remedied by monetary damages alone, and PBTC has no adequate remedy at law.

173. The balance of harms favors PBTC because Defendants have no legitimate interest in transferring, concealing, using, dissipating, encumbering, exchanging, or interfering with assets that belong to PBTC, while PBTC faces irreparable harm absent relief.

174. Injunctive relief is in the public interest because it enforces orders of this Court, preserves assets transferred through a court-approved sale, prevents dissipation of property subject to that sale, and protects the integrity of judicial process.

175. Accordingly, PBTC seeks a preliminary injunction enjoining Defendants and those acting in concert with them from selling, transferring, assigning, pledging, encumbering, exchanging, converting, spending, moving, concealing, accessing, using, dissipating, or exercising control over the Bitcoin Assets, any wallets, private keys, seed phrases, accounts, proceeds, or traceable assets related thereto.

176. PBTC further seeks an order compelling Defendants to preserve and disclose all wallets, private keys, seed phrases, exchange accounts, custodial accounts, transaction records, devices, communications, and other information or credentials necessary to locate, preserve, access, control, or transfer the Bitcoin Assets.

177. Upon final adjudication of its claims, PBTC will be entitled to permanent injunctive relief to prevent Defendants from retaining, transferring, concealing, dissipating, using, or otherwise interfering with the Bitcoin Assets, access credentials, proceeds, or traceable property, according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants and requests the following relief:

i. Entry of a preliminary injunction and permanent injunction barring all Defendants and those acting in concert with them from accessing, using, transferring, selling, assigning, pledging, encumbering, exchanging, converting, spending, moving, concealing, dissipating, or exercising any other actions with respect to the Bitcoin Assets, and compelling Defendants to preserve and disclose all wallets, private keys, seed phrases, exchange accounts, custodial accounts, transaction records, devices, communications, and other information or credentials necessary to locate, preserve, access, control, or transfer the Bitcoin Assets, all as more particularly described in the form of order attached to *the Motion By PBTC Recovery Partners, LLC For Preliminary Injunction And Related Relief*;

ii. Entry of judgment requiring Defendants to turn over to PBTC all Bitcoin Assets, including all bitcoin, wallets, private keys, seed phrases, wallet files, access credentials, proceeds, and property traceable thereto;

iii. Entry of an order awarding compensatory damages to PBTC, including damages for loss of use, diminution or fluctuation in value, transaction fees, costs of recovery, investigation and remediation costs, consequential damages, qualifying CFAA losses, breach of contract, and any other damages caused by Defendants' conduct;

iv. Exemplary, punitive, or enhanced damages to the extent available under applicable law;

v. Entry of judgment for restitution and disgorgement of all benefits obtained by Defendants from the Bitcoin Assets;

vi. Imposition of a constructive trust over the Bitcoin Assets, any access credentials necessary to control or transfer them, any proceeds, appreciation, profits, or substitute property derived therefrom, and any property traceable to the Bitcoin Assets;

vii. Entry of judgment requiring Defendants to provide a full accounting of all Bitcoin Assets, access credentials, wallets, transfers, transactions, proceeds, and any other property received, held, transferred, or disposed of by each Defendant relating to the Bitcoin Assets;

viii. Recovery from Penn of all money and Bitcoin had and received, including all payments made by Kahan and his associates to Penn, the approximately 654 Bitcoin removed by Penn as an unauthorized fee, and any proceeds, appreciation, or profits derived therefrom;

ix. Pre- and post-judgment interest according to proof, and the costs of this action; and

x. A finding that participating Defendants are jointly and severally liable for all damages caused by their actions; and

xi. Such other relief as this Court deems just and proper under the circumstances.

Dated: October 12, 2026

**NIXON PEABODY LLP**

/s/ *Richard C. Pedone*

Richard C. Pedone (BBO # 630716)
Morgan C. Nighan (BBO # 679546)
Daniel P. McMonagle (BBO # 713426)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 345-1000
Email: rpedone@nixonpeabody.com
mnighan@nixonpeabody.com
dmcmonagle@nixonpeabody.com

-and-

Christopher Fong (*pro hac vice*)
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036
Telephone: (212) 940-3724
Email: cfong@nixonpeabody.com

*Counsel to PBTC Recovery Partners, LLC*